2004-NMSC-008

88 P.3d 845

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Valente BALDERAMA, Defendant–
Appellant.**

No. 27,225.

Supreme Court of New Mexico.

March 1, 2004.

Certiorari Granted Sept. 11, 2003.

John Bigelow, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Respondent.

**OPINION**

CHÁVEZ, Justice.

{1} Having granted the State's motion for rehearing in this case, we withdraw the opinion filed June 11, 2003 and substitute the following in its place.

{2} Defendant, Valente Balderama, appeals his conviction of first-degree deliberate-intent murder. *See* NMSA 1978, § 30–2–1(A) (1994). Defendant admitted at trial that he killed Victim, but argued that he did not form the deliberate intent to kill her. He raises two issues on appeal. First, he argues the trial court committed reversible error when it sua sponte excluded the expert testimony of Defendant's sole witness, a neuropsychologist. The expert was prepared to testify regarding Defendant's neurological deficits, which Defendant contends were relevant to whether he formed the deliberate intent to kill Victim. Second, Defendant contends the trial court abused its discretion by admitting a hearsay statement of Victim regarding his prior bad acts. With regard to the first issue, we hold that the evidence was admissible, not for the purpose of proving the inability to deliberate, but rather to show that he did not form a deliberate intent to kill, and that the trial court abused its discretion by excluding it. With regard to the second issue, we hold that the trial court did not abuse its discretion in admitting the evidence as an excited utterance, but that on retrial the court should determine whether the statement is inadmissible character evidence. Accordingly, we reverse the trial court and remand for a new trial consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

{3} Victim's decomposing body was discovered among some mesquites outside of Deming, New Mexico, on August 16, 2000. A forensic pathologist testified that she had suffered numerous injuries, including fractures to the front of the skull involving both eye sockets, a fracture to the rear of the skull, fractures of the spinous process of the cervical column consistent with a twisting of the neck or blunt force, fractured ribs, and

bruises to the thigh and lower back. The pathologist concluded that Victim's death was caused by blunt-force injuries to the head and neck.

{4} Three men were arrested in connection with the murder: Defendant and his two acquaintances, Arturo Carbajal and Robert Bertola. Carbajal entered into a plea agreement with the State and was the State's primary witness at trial. According to Carbajal, the three men went looking for Victim because Defendant said he wished to speak with her. The men located Victim, who was visiting a friend's house, but Defendant decided not to approach her at that time. Instead, Defendant drove away in Bertola's truck, while Carbajal and Bertola approached Victim and asked her for a ride to the store.

{5} Carbajal testified that, after going to the store with Victim and Carbajal, Bertola asked Victim "if she wanted to party and get crazy." At some point while the three were driving around Deming in Victim's car, Victim requested that Bertola take over the driving responsibilities. She also suggested that they needed to leave the city limits. Bertola then drove them to a remote location outside of Deming. Bertola stopped the car in a field near a tree after stating that he needed to use the restroom. Bertola got out of the car and stood next to the car for about ten minutes until Defendant arrived, driving Bertola's truck. Defendant parked the truck about ten feet behind Victim's car.

{6} According to Carbajal, he was seated on the passenger side of Victim's car when Defendant arrived. At the insistence of Defendant, Carbajal got out of the car and stood near the rear of the passenger side of the car. He saw Defendant grab Victim, who then started slapping Defendant. Defendant then pulled her out of the car, threw her onto the ground, and began kicking her. Victim grabbed Carbajal's leg, begging him to help her, but he chose not to help. Defendant began to twist Victim's neck and, as he was doing so yelled: "[T]his whore doesn't want to die. I need something to kill her, to kill this whore." Defendant walked to Bertola's truck, then returned with a steel pipe in his hand to where Victim lay unconscious and struck her on the neck and head. Defendant

then tossed the pipe into the back of the truck and urged the other two men to help him load the body in the trunk of Victim's car. The three men drove the car about a quarter of a mile from the murder scene and concealed Victim's body among some mesquites. They then washed the blood from the trunk of Victim's car before driving it to Palomas, Mexico, where they were eventually apprehended.

{7} Based on this evidence, and testimony that Defendant had made previous threats against Victim, the State requested a verdict of first-degree murder. According to the State, Defendant had orchestrated a plan to lure Victim to the murder scene, where he deliberately killed her. As evidence of deliberate intent, the State pointed to: (1) previous threats against Victim made by Defendant; (2) the alleged plan to lure her to the murder scene; (3) evidence that Defendant had the presence of mind during his initial beating of Victim to stop, demand a murder weapon, walk away from his victim to retrieve the murder weapon, and then return to kill her; and (4) Defendant's activity following the murder in disposing of evidence and fleeing the country.

{8} Defendant sharply contested Carbajal's credibility at trial. Defendant challenged Carbajal's objectivity on the basis that Carbajal testified for the State pursuant to a plea agreement. Although Carbajal was initially charged with murder, his charges were eventually reduced to receiving or transferring a stolen vehicle and tampering with evidence. Additionally, on cross-examination, Carbajal admitted there were significant inconsistencies between statements he made prior to entering into the plea agreement and statements he later made while testifying for the State.

{9} Although Defendant did not testify, his statement to police regarding the events of the murder came into evidence through another State witness, Detective Frank Peña, who questioned Defendant after his arrest. Defendant's version of the events differed significantly from Carbajal's.

{10} According to Defendant's statement, after he left Bertola and Carbajal near the

house where Victim was staying, Defendant had been "driving around and cruising" in Bertola's truck when he observed Victim driving with Bertola and Carbajal in Victim's car. Defendant told Detective Peña that "he was falling in love with her" and that he was "worried that something was going to happen to her" in the car with the other men. Defendant said that he began to follow the car, "wanting to know where they were going." When Victim's car stopped in a field, Defendant pulled up behind it in Bertola's truck.

{11} According to Defendant, he approached Victim and asked her to leave with him, but she refused. Defendant told Detective Peña that as he was speaking with her, one of the other two men struck Victim in the face. Defendant admitted to "getting extremely angry" at Bertola and Carbajal, and said he wanted to "kick their asses." Rather than confront the two men, however, Defendant began to walk back toward the truck. According to Defendant, Victim followed, yelling at him and pushing him. As Defendant turned to face Victim, Bertola knocked her to the ground and went to his truck to retrieve a steel pipe. Defendant claimed that Bertola returned, struck Victim with the pipe, then threw the pipe to Defendant. Defendant struck her on the head and neck, then dropped the pipe to the ground.

{12} Defendant admitted that Victim was still alive when he struck her twice with the pipe. He told Detective Peña that after he struck Victim, he heard Bertola and Carbajal arguing, "stating something to the effect that they had to finish her. They had to kill her." Defendant said that he had difficulty recalling the details and that he had "blanked out" during the murder.

{13} Because Defendant admitted to killing Victim with the pipe, the sole issue at trial was whether he was guilty of first-or second-degree murder. The State argued Victim's murder was committed with deliberate intent to kill, constituting first-degree murder. Defendant contended that he killed Victim as the result of a "mere unconsidered and rash impulse," constituting second-degree murder. Defense counsel repeatedly denied that Defendant was involved in any kind of plan, either to lure Victim to the remote area or to kill her. The defense's theory was that Defendant came upon Victim, Bertola and Carbajal, and "whether it was for [Victim's] own protection or in and out of jealousy, he beat [Victim] with that pipe. He didn't stop and consider the consequences of his actions. He didn't plan it. . . . He came upon them and went off."

{14} Defendant identified only one witness, Dr. Marc Caplan, Ph.D., a neuropsychologist, to support his theory that he killed Victim as the result of a mere unconsidered and rash impulse. Dr. Caplan was expected to provide expert testimony that Defendant suffered neurological deficits, of unknown etiology, that resulted in "difficulty planning and anticipating as well as greater difficulty controlling angry impulses." Dr. Caplan's testimony was revealed to the State in advance of trial, and the prosecutor was given an opportunity to interview him. The State neither filed pretrial motions challenging the admissibility of Dr. Caplan's testimony nor did it object to his testimony during trial.

{15} During her opening statement to the jury, defense counsel expressly relied on Dr. Caplan's anticipated testimony. Defense counsel informed jurors that they would hear from Dr. Caplan, who had conducted a neuropsychological evaluation of Defendant, and that Dr. Caplan would testify that Defendant "suffers from impulse control disorder and . . . has difficulty planning." According to Defendant, Dr. Caplan's testimony was critical to the defense's theory of the case, because it directly impacted on the sole remaining issue: whether Defendant killed with deliberate intent (first-degree murder) or as a result of a mere unconsidered and rash impulse (second-degree murder).

{16} During a bench conference at the end of the second day of trial, defense counsel explained to the court that she needed to alert Dr. Caplan as to when he would testify so that he could cancel patient appointments. The trial judge indicated that it was possible for Dr. Caplan to testify out of order. In response, the prosecutor explained that he had the same problem with his forensic expert and that the State might complete its case sooner than expected. To this the trial judge replied, "Well, then we won't have to have Dr. Caplan then, will we?" There was

no discussion concerning the admissibility of Dr. Caplan's testimony. Indeed, the trial court concluded the discussion by instructing the parties: "Well, we'll take him out of order. I mean, whatever time we decide that he's going to block off his schedule, he's going to testify during that period of time, whether it's in your case or it's in her case."

{17} At midmorning the next day the State rested its case. Defense counsel advised the court that Dr. Caplan would not be available to testify until 2:00 p.m., as he was traveling to the courthouse from out of town. The judge then explained to the jury: "[W]e understand that the defense is going to put on Dr. Caplan; he's not going to be here until 2:00. We apologize for that but that happens in these cases. So I'm going to send you home for a long lunch. So you need to be back here around 1:45."

{18} The next event in the record is a telephone conference with Dr. Caplan, during which he was placed under oath and questioned by defense counsel, the prosecutor, and finally the trial judge himself. What precipitated this telephone conference is unclear. What is evident from the record is that at no point did the prosecutor object to the anticipated testimony of Dr. Caplan. Rather, after speaking with Dr. Caplan telephonically and reviewing Dr. Caplan's report, the trial court sua sponte excluded Dr. Caplan's testimony, citing Rules 11–401, 11–402 and 11–403 NMRA 2001. The trial court concluded that it would be misleading to the jury to present psychological testimony when that testimony would not support an instruction on diminished capacity, *see* UJI 14–5110 NMRA 2004, and therefore the testimony was irrelevant and a "waste of time." When the jury returned from lunch, without making any reference to the promised testimony of Dr. Caplan, the trial court told the jury, "You have now heard all the evidence in this case." The jury then deliberated and returned a guilty verdict on the charge of first-degree murder, from which Defendant now appeals.

## DISCUSSION

### I. Exclusion of Dr. Caplan's Testimony

{19} As a preliminary matter, the State argues that Defendant did not preserve the issue of the admissibility of Dr. Caplan's testimony. The State's argument is not well taken. Rule 12–216(A) NMRA 2004 states that to preserve an issue for review "it must appear that a ruling or decision by the district court was fairly invoked, but formal exceptions are not required." In explaining why we decline to require "formal exceptions," we have stated that our rule "disregards form and relies upon substance, and merely requires that a question be fairly presented to the court and a ruling invoked." *Bays v. Albuquerque Nat'l Bank*, 34 N.M. 20, 21, 275 P. 769, 770 (1929). In this case, the issue of the admissibility of Dr. Caplan's testimony was fairly presented to the court, and a ruling was fairly invoked inasmuch as the court invoked its own ruling.

{20} While a trial judge is not prohibited from excluding evidence sua sponte, a judge should exercise this authority sparingly. This is because: (1) development of the facts at trial is the responsibility of counsel; (2) often counsel may intentionally withhold objection to the admissibility of evidence for strategic reasons; and (3) a trial judge should be careful to avoid the appearance of being more of an advocate or partisan than an objective jurist. *See Chapman v. California*, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (listing the right to an impartial judge as basic to a fair trial). When a trial judge, however, feels compelled to exclude evidence sua sponte, the parties should first be informed of the judge's specific concerns. This should be done on the record, before excluding the evidence, and outside the presence of the jury. This procedure will afford the proponent of the evidence a fair opportunity to respond to the court's concerns and to make the necessary offer of proof prior to the sua sponte ruling. Our rules of evidence require no less of counsel who object to the admissibility of evidence, *see* Rule 11–103(A)(1) NMRA 2004, and we see no reason why the same procedural rules should not apply to a trial judge who seeks to exclude evidence sua sponte. Here, while the preferred practice would have been for defense counsel to reiterate

clearly for the court the purpose for which she was offering Dr. Caplan's testimony and to formally object to the trial court's ruling, we believe this failure by defense counsel does not preclude review.

{21} Rule 11–103(A) requires as a predicate for preservation that the ruling affect "a substantial right of the party" and, where the ruling is one excluding evidence, that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Rule 11–103(A)(2). Although we are not required to review every sua sponte exclusion of evidence that is made without a timely objection by counsel, Rule 11–103(A) and Rule 12–216(A) clearly permit review in this case because the substantial rights of Defendant were affected by the trial court's ruling and the substance of the evidence to be admitted was made known or was apparent to the court. The fact that the trial court ruled sua sponte to exclude the testimony—combined with the fact that the defense presented only one issue to the jury, offered only one witness to testify on that issue, and reasonably relied on the trial court's earlier pronouncements to counsel and to the jury that Dr. Caplan would testify—exacerbates the potential that the alleged error is fundamental. *See State v. Garcia,* 46 N.M. 302, 309, 128 P.2d 459, 462 (1942) (fundamental error must go to the foundation of the defendant's case or take from the defendant a right which was essential to his defense). We therefore reject the State's argument that the issue was inadequately preserved.

■ {22} Having decided to review this issue, we examine the proposed evidence to determine whether the trial court abused its discretion in excluding it. *State v. Stanley,* 2001–NMSC–037, ¶ 5, 131 N.M. 368, 37 P.3d 85. An abuse of discretion occurs when the ruling is clearly against the logic and effects of the facts and circumstances of the case, is clearly untenable, or is not justified by reason. *Id.* Whether the trial court abused its discretion depends on an analysis of (1) whether Dr. Caplan's testimony was relevant; and (2) if relevant, whether the testimony was properly excluded under Rule 11–403 as misleading or a waste of time. Final-

ly, if the court erred in excluding the evidence, we examine whether the error was harmless.

## A. Relevancy of the testimony

■ {23} All relevant evidence is generally admissible, unless otherwise provided by law, and evidence that is not relevant is not admissible. Rule 11–402 NMRA 2004. " 'Relevant evidence' means evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 11–401 NMRA 2004 (emphasis added). Any doubt whether the evidence is relevant should be resolved in favor of admissibility. *Stanley,* 2001–NMSC–037, ¶ 6, 131 N.M. 368, 37 P.3d 85.

■ {24} In reviewing the relevancy of Dr. Caplan's testimony, we first consider whether his testimony directly related to Defendant's theory of the case. *See State v. Melendez,* 97 N.M. 740, 742, 643 P.2d 609, 611 (Ct.App.1981) (stating that tendered evidence of the victim's reputation for violence was relevant to the defendant's claims that occupants of a car were aggressors and that he had reasonable apprehensions for his life and safety), *rev'd on other grounds,* 97 N.M. 738, 643 P.2d 607 (1982); *State v. Debarry,* 86 N.M. 742, 743–44, 527 P.2d 505, 506–07 (Ct.App.1974) (remanding for in-camera hearing to determine whether excluded testimony was relevant to the defendant's misidentification defense, with instructions to grant a new trial if the testimony was sufficiently relevant to defendant's theory). Defendant's theory was that he did not form the deliberate intent to kill Victim and therefore was not guilty of first-degree murder. In New Mexico, first-degree murder is defined as "any kind of willful, deliberate and premeditated killing." Section 30–2–1(A)(1); *see State v. Coffin,* 1999–NMSC–038, ¶¶ 25–29, 128 N.M. 192, 991 P.2d 477 (outlining the legal history of first-degree murder in New Mexico and clarifying that deliberation, defined as "a thinking over with calm and reflecting mind," is the defining characteristic of the requisite mental state for first-degree

murder) (quoting *State v. Smith,* 26 N.M. 482, 491, 194 P. 869, 872 (1921)).

{25} Because deliberation is an essential element of first-degree murder, evidence with any tendency to make the existence of deliberation more probable or less probable is by definition relevant to the distinction between first-and second-degree murder. *See* Rule 11–401. Uniform Jury Instruction 14–201, which was given to the jury in this case, defines "deliberate intention" as follows:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of *careful thought and the weighing of the consideration for and against the proposed course of action.* A calculated judgment and decision may be arrived at in a short period of time. *A mere unconsidered and rash impulse,* even though it includes an intent to kill, *is not a deliberate intention to kill.* To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

UJI 14–201 NMRA 2004 (emphasis added).

{26} Defendant contends that Dr. Caplan's testimony regarding Defendant's neurological deficits was relevant because, if believed by the jury, it would tend to make less probable the State's theory that Defendant killed "as a result of careful thought and the weighing of the consideration for and against the proposed course of action." Defendant argues that a reasonable juror could infer from Dr. Caplan's testimony that when Defendant killed Victim, he did so more likely as the result of an "unconsidered and rash impulse" and less likely as a result of "careful thought."

{27} We conclude that, had the jury been provided with Dr. Caplan's testimony regard-ing Defendant's neurological deficits, the jury would have had specific evidence tending, to some degree, to refute the element of deliberation necessary for first-degree murder. Dr. Caplan performed a neuropsychological forensic evaluation of Defendant, which consisted of fourteen diagnostic tests and the collection of an extensive psychosocial history. Dr. Caplan's evaluation report, which was reviewed by the trial court, describes Defendant's history of closed head injuries and a "constellation of behavioral problems ... suggestive of frontal lobe dysfunction." This neurological dysfunction "results in difficulties in planning and anticipating as well as greater difficulty controlling angry impulses." Defendant told Dr. Caplan that, since the age of sixteen or seventeen, he has had "blackouts" and becomes "unaware of what happens" when he is in a rage.[1] Dr. Caplan diagnosed Defendant with impulse-control disorder, polysubstance abuse, and antisocial personality disorder. Dr. Caplan concluded his report: "Given this man's history and evidence of neurological deficits, there is some evidence for diminished capacity. Historically he presents with a constellation of behaviors that suggest significant problems in controlling impulses, planning and anticipating dangerous situations and the ability to postpone or discriminate in achieving his goals." During the offer of proof via telephone conference, Dr. Caplan repeated that Defendant has neurological dysfunction, which results in problems with impulse control and difficulty in planning. Dr. Caplan described Defendant's neurological dysfunction as "sort of the underpinning to diminished capacity, in other words difficulty in judging, difficulty in appreciating consequences of one's actions, difficulty in planning." Dr. Caplan further indicated that substance abuse tends to "further impair whatever kind of abilities [Defendant] had."

{28} We conclude that Dr. Caplan's testimony was relevant, because it would assist the jury in weighing Defendant's contention

1. Dr. Caplan also noted in his report that while Defendant claimed a history of "blackouts," he performed "quite well" on memory tests. Additionally, Dr. Caplan stated that while Defendant claimed he had difficulty recalling details of the offense, when evaluated by Dr. Caplan he was able to recall many such details. For this reason, the testimony of Dr. Caplan, once admitted, would be helpful to the prosecution to impeach Defendant's statement to Officer Peña that he was "blanking out" and unable to recall many details of the murder.

that he lacked the deliberate intent necessary for first-degree murder. Dr. Caplan's testimony regarding Defendant's impulsiveness and difficulty in planning, if believed, supported Defendant's theory that he did not act with calculated judgment, but rather he "came upon" Victim, Bertola, and Carbajal and "went off." Dr. Caplan's testimony was relevant to whether Defendant formed the intent to murder Victim "as a result of careful thought and the weighing of the consideration for and against a proposed course of action," or whether he killed her as the result of a "mere unconsidered and rash impulse." UJI 14–201.

■ {29} In attempting to refute the relevancy of Dr. Caplan's testimony, the State correctly points out that Dr. Caplan was also prepared to testify that Defendant was capable of forming specific intent. The specific intent required for first-degree murder is a *deliberate* intent, which by definition involves careful thought and the weighing of the consideration for and against a proposed course of action, and does not describe every intentional killing. *See State v. Campos*, 1996–NMSC–043, ¶ 39, 122 N.M. 148, 921 P.2d 1266 ("It is [the] deliberate intent to cause death, beyond the defendant's intentional actions, that makes premeditated first-degree murder a specific-intent crime.").

■ {30} Defendant's theory at trial, however, was not that Defendant was incapable of forming deliberate intent, and Defendant therefore did not raise the diminished-capacity defense.[2] Defendant's strategy was to show that he did not, at the time of the killing, form the deliberate intent to kill. He sought to raise a reasonable doubt about whether the State carried its burden of proving the mental state required for first-degree murder. Dr. Caplan clearly viewed Defendant's neurological deficits, with resulting impulsiveness and difficulty in planning, as distinct from the *ability* to form deliberate

intent. During the telephone conference Dr. Caplan clarified that Defendant's neurological dysfunction was not the same thing as an inability to form specific intent: "[Defendant] impulsively acts but he does understand that his actions may be wrong. So he is able to form specific intent, but there are difficulties with his judgment, his planning, his patience." Thus, Dr. Caplan was clear in his testimony and in his report that Defendant's neurological deficits were not so severe as to wholly subvert his ability to deliberate.

■ {31} Proof of incapacity to form the requisite deliberate intent, however, is not the only means of defending against the State's allegation that the defendant acted with the deliberate intent to take away the life of the victim. "An abnormal mental condition may influence the probability that a defendant premeditated and deliberated— and so be taken into account by a jury in determining whether those states of mind existed in fact (beyond a reasonable doubt)— even though it did not eliminate the capacity for premeditation." *United States v. Peterson*, 509 F.2d 408, 416–17 (D.C.Cir.1974). "[E]xpert testimony is admissible if it merely 'support[s]' an inference or conclusion that the defendant did or did not have the requisite mens rea.'" *United States v. Bennett*, 161 F.3d 171, 183 (3rd Cir.1998) (quoting *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir.1997)). Thus, we conclude that evidence of the condition of the mind of the accused at the time of the crime may be introduced, not only for the purpose of proving the *inability* to deliberate, but also to prove that the conditions were such that Defendant *did not in fact*, at the time of the killing, form a deliberate intent to kill. *See State v. Ellis*, 89 N.M. 194, 548 P.2d 1212 (Ct.App.1976) (holding it was reversible error to exclude the defendant's tendered expert testimony regarding the defendant's mental state at the time of the homicide).

---

2. We note that the term "diminished capacity," although a term of art, is somewhat misleading and has resulted in considerable confusion. In *State v. Padilla*, 66 N.M. 289, 292, 347 P.2d 312, 314 (1959), we noted that the terms, "diminished responsibility" and "partial responsibility" were misnomers, and that the theory in fact "contemplates full responsibility, not partial, but only for

the crime actually committed." The same is true with respect to the term, "diminished capacity," which contemplates not a partial ability but an inability to form specific intent. Therefore, the term "diminished capacity" should be carefully construed to mean an inability to form specific intent. *See* UJI 14–5110 NMRA 2004.

{32} In concluding that Dr. Caplan's testimony was relevant, we note that New Mexico courts have long allowed such expert testimony relating to a defendant's mental state at the time of the commission of the offense. *See id.; see also State v. Elliott,* 96 N.M. 798, 635 P.2d 1001 (Ct.App.1981); *State v. Smith,* 80 N.M. 126, 452 P.2d 195 (Ct.App.1969).

{33} In *Elliott,* the Court of Appeals held that the trial court's exclusion of a psychologist's expert testimony that defendant lacked the intent to kill or do great bodily harm was reversible error. 96 N.M. at 800, 635 P.2d at 1003. In response to the trial court's ruling that, under Rule 11–702, the expert testimony would not assist the jury in determining the factual issue of intent, the Court of Appeals held: "This may be the trial court's subjective evaluation of testimony by a psychologist, but it is not New Mexico law. The opinion of an expert, whose qualifications are not challenged, would assist the jury in deciding the intent issue, and the expert opinion was admissible." *Elliott,* 96 N.M. at 800, 635 P.2d at 1003; *see* Rule 11–702 NMRA 2004. We agree that this remains the law in New Mexico.

{34} In *Ellis,* the defendant at trial offered the expert testimony of a clinical psychologist to show that the defendant shot the victim out of fear and therefore did not have the requisite intent for either first-or second-degree murder. The defendant expressly disclaimed she was relying on the defenses of insanity or diminished capacity. 89 N.M. at 196–97, 548 P.2d at 1214–15. On the basis that Rule 11–702 admits expert testimony if such testimony will assist the jury to determine a fact in issue, the Court of Appeals held that it was error to exclude the testimony, stating that "expert testimony as to defendant's 'probable state of mind' was admissible ... [and] a properly qualified expert may testify as to a defendant's intent." *Id.* at 197, 548 P.2d at 1215.

{35} Finally, in *Smith,* the trial court admitted the expert testimony of a psychologist and two psychiatrists that defendant was "in-

clined to violent emotional eruptions, and that when in a rage he is unable to control himself." 80 N.M. at 129, 452 P.2d at 198. The defendant introduced this evidence not to establish the defense of insanity or inability to form specific intent, but rather to show that the defendant, at the time of the killing, did not possess the requisite mental state for second-degree murder. *Id.* at 130, 452 P.2d at 199. In affirming the conviction, the Court of Appeals stated: "The jury was not required to accept these expert opinions and disregard all other evidence bearing on the question of his mental and emotional state...." *Id.* The same is true in Defendant's case, and, although Dr. Caplan's testimony is relevant to Defendant's mental state at the time of the killing, the jury is free to give it little weight, or to reject it altogether.

{36} Because we hold that Dr. Caplan's testimony was relevant to the essential element of deliberate intent, and because the testimony was not cumulative, we conclude that the trial court's exclusion on the basis that it was a "waste of time" was error. *See* Rule 11–403 NMRA 2004.

## B. Exclusion on the basis of misleading the jury

{37} The State also argues that the trial court properly excluded Dr. Caplan's testimony under Rule 11–403 because it would be misleading to allow expert testimony that does not support the giving of the diminished-capacity instruction, UJI 14–5110. *See State v. Lujan,* 94 N.M. 232, 234, 608 P.2d 1114, 1116 (1980) ("[U]nless there is evidence that the defendant could not have formed the requisite intent, the diminished responsibility instruction is improper.").[3] Defendant concedes the evidence was not sufficient to support the giving of the diminished-capacity instruction. We agree. Dr. Caplan was clear in his testimony and in his report that Defendant's neurological deficits did not reach the degree that would interfere with defendant's ability to deliberate.

---

3. The State overstates the holding in *Lujan* when it asserts that *Lujan* precludes the admission of evidence falling short of incapacity to form specific intent. *Lujan* addressed whether the diminished-capacity instruction would be proper where the evidence falls short of incapacity. The admissibility of such evidence was not at issue in *Lujan,* and indeed the defendant in that case was allowed to present such expert testimony to support his theory of the case.

{38} This distinction is significant because in those cases where the evidence does support the diminished-capacity instruction, an additional burden of proof is added to the prosecution. The diminished-capacity instruction is proper only when there is evidence that reasonably tends to show that the defendant's claimed mental disease or disorder rendered the defendant incapable of forming specific intent at the time of the offense. *See State v. Begay*, 1998–NMSC–029, ¶ 38, 125 N.M. 541, 964 P.2d 102. When UJI 14–5110 is given, the use note instructs the trial court to add the following instruction to the essential elements of the first-degree murder instruction: "The defendant was not suffering from a mental disease or disorder at the time the offense was committed to the extent of being incapable of forming [a deliberate] intent to take away the life of another."[4] *See Begay*, 1998–NMSC–029, ¶¶ 39, 41, 125 N.M. 541, 964 P.2d 102. When the defendant has advanced evidence that reasonably tends to show an incapacity to form specific intent, the prosecution then has the additional burden of proving the defendant was capable of forming the deliberate intent despite the alleged intoxication or mental disorder. Here, Defendant concedes he did not offer such evidence, and therefore the prosecution does not have the additional burden of proving that Defendant was capable of forming the deliberate intent to kill.

{39} The court nevertheless raised the legitimate concern that the jury might be misled where such expert testimony is insufficient to warrant the diminished-capacity instruction. This concern is legitimate because the jury might interpret Dr. Caplan's testimony to mean that Defendant's neurological deficits prevented him from being capable of forming the deliberate intent to kill, and that therefore he did not. Nevertheless, we hold that the probative value of the testimony in this case outweighs the danger of misleading the jury, and that the

testimony should not have been excluded on that basis.

{40} We believe that in cases in which expert testimony is offered to prove or disprove a mens rea element, it is often appropriate for the trial court to make explicit to the jury the precise purposes for which the expert testimony is offered. *See Peterson*, 509 F.2d at 414 (recognizing that the admission of expert testimony regarding the defendant's abnormal mental condition requires "careful administration by the trial judge"). In order to mitigate the potential of misleading the jury and thereby prejudicing the prosecution, while at the same time preserving Defendant's right to challenge the State's evidence against him, a limiting instruction may be appropriate. On remand, assuming the testimony of Dr. Caplan is not excluded on different grounds, we suggest the following jury instruction as a model:

> You must not conclude from Dr. Caplan's testimony that Defendant was incapable of forming the deliberate intention to take away the life of another. This expert testimony was admitted solely to assist you in determining, based on all of the facts and circumstances of the killing, including Defendant's mental condition, whether Defendant in fact formed a deliberate intention to take away the life of Victim rather than an unconsidered and rash impulse.

*Cf. Peterson*, 509 F.2d 408, 415 (suggesting as a model the following instruction: "In determining whether (premeditation and deliberation) has been proved beyond a reasonable doubt you may consider the testimony as to the defendant's abnormal mental condition."). Furthermore, we note that the State also has the opportunity through cross-examination and argumentation to clarify any confusion that may result from Dr. Caplan's direct testimony.

### C. Harmless Error

{41} The State's final argument is that any error in the exclusion of Dr. Caplan's testimony was harmless, because

---

**4.** As currently drafted, this additional instruction only describes a general intent to kill ("an intent to take away the life of another"). Because intoxication or mental disease or disorder is a defense to the specific intent of "deliberate inten-

tion," this instruction requires revision. The phrase "an intent" must be changed to "a deliberate intention" in order to accurately articulate the mental state at issue.

his testimony would have lost all persuasive force given the weight of incriminating evidence. Defendant does not challenge the sufficiency of the evidence to convict him of murder. Rather, Defendant argues that he was denied the opportunity to present evidence that had a tendency to make his theory of the case—that he did not form the deliberate intent to kill—more probable. Error in the exclusion of evidence in a criminal trial is prejudicial and not harmless if there is a reasonable possibility that the excluded evidence might have affected the jury's verdict. *See Clark v. State,* 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991) (holding that the admission of evidence was not harmless if there was a reasonable possibility that evidence might have contributed to conviction). Here the inquiry is whether there is a reasonable possibility the trial court's exclusion of Dr. Caplan's testimony might have contributed to Defendant's conviction for first-degree rather than second-degree murder.

{42} Although there was overwhelming evidence that Defendant killed Victim, the evidence was in direct conflict as to whether Defendant killed with deliberate intent or through a rash impulse. The only eyewitness testimony regarding Victim's murder was that provided by Carbajal, whose credibility was sharply contested at trial. If we accept only the testimony of Carbajal, ignore the defense's cross-examination of him and also ignore Defendant's account of the events of the murder, then surely the error is harmless. The evidence would overwhelmingly support the conclusion that Defendant murdered the Victim and did so with the requisite deliberate intent. However, we should not ignore the cross-examination or the testimony which introduced Defendant's version of the events.

{43} Defendant's statement was to the effect that after being pushed and yelled at by the Victim as he tried to walk away, Bertola became the aggressor, struck Victim first, and threw the steel pipe to the Defendant; then, while "blanking out," Defendant suddenly struck Victim and dropped the pipe to the ground. Dr. Caplan was Defendant's only witness, and his testimony represented Defendant's entire case to rebut the essential element of deliberate intent. Dr. Caplan's testimony was Defendant's only means of reinforcing his theory of the case and bringing together what trial counsel argued in both her opening and closing statements. Defendant's utter dependence on Dr. Caplan for his defense exacerbates the potential for prejudice caused by the exclusion of Dr. Caplan's testimony. *See State v. Ellis,* 136 Wash.2d 498, 963 P.2d 843, 856 (1998) (holding the trial court's decision to exclude expert testimony on the defendant's inability to form specific intent in a first-degree murder trial deprived him of his constitutional right to present evidence in his own defense). As a result, Defendant has raised a reasonable possibility that the exclusion of his only witness might have contributed to his conviction on the greater charge rather than the lesser.

{44} In addition, we note the timing of the court's decision to exclude Dr. Caplan's testimony could not have been worse. The court took its action, without any advance notice, at a time when defense counsel had already relied on Dr. Caplan's anticipated testimony in her opening statement. Defense counsel not only summarized that anticipated testimony to the jury, but identified Dr. Caplan by name. The trial court also informed the jury that Dr. Caplan would be testifying for Defendant. When the promised witness did not appear, the jury may well have drawn a negative inference prejudicial to Defendant. A jury would certainly be inclined to wonder why the only witness identified by defense counsel, who was to help them determine whether the murder was committed with deliberate intent, did not testify. For example, the jury might have inferred that Dr. Caplan was not prepared to testify as defense counsel indicated in her opening, or even that his testimony would contradict the defense's theory. Without any advance notice of the court's contemplated action, Defendant was entitled to rely on judicial rulings and discussions in planning his defense strategy and in summarizing that strategy to the jury.

{45} Our Court of Appeals enunciated a similar rationale in reversing a murder conviction and remanding for a new trial. In *State v. Glasgow,* 2000–NMCA–076, 129 N.M. 480, 10 P.3d 159, the trial court during trial

changed course from its earlier rulings excluding all evidence of cocaine use, and ruled the evidence admissible if the defendant took the stand to testify as to his state of mind. *Id.* ¶ 9. In reversing and remanding for a new trial, the Court of Appeals stated that the defendant "had the right to plan his defense strategy relying on the trial court's ruling that there would be no evidence of drug use introduced to the jury." *Id.* ¶ 10. "Our criminal trial system entitles a defendant to formulate a strategy to defend the charges brought by the State." *Id.* ¶ 14 (citing N.M. Const. art. II, § 14; *March v. State*, 105 N.M. 453, 456, 734 P.2d 231, 234 (1987)). In considering the totality of the circumstances, we are not persuaded that the exclusion of Dr. Caplan's testimony was harmless error.

## II. Admission of Victim's Hearsay Statements

{46} Defendant also argues that the trial court abused its discretion by admitting an out-of-court statement that Victim made to her cousin, Robert Snow. The New Mexico Rules of Evidence prohibit the use of out-of-court statements, offered to prove the truth of the matter asserted, unless such a statement falls into a recognized hearsay exception and is relevant and otherwise admissible. *See* Rule 11–801 NMRA 2004 (describing hearsay rule); Rule 11–401; Rule 11–403. We review the trial court's admission of hearsay statements for an abuse of discretion. *State v. Lopez*, 2000–NMSC–003, ¶ 10, 128 N.M. 410, 993 P.2d 727.

{47} Snow testified that Defendant and Victim went to his house in Victim's car, about a week before Victim was murdered. Defendant was driving and Victim looked "distraught" and "like she'd been crying." Snow "asked [Victim] to come out of the vehicle so [he] could see what was wrong with her." When Snow asked Defendant what was going on, Defendant said that he and Victim were "domesticating, fighting." According to Snow, Defendant ordered him "not to let [Victim] use the [tele]phone or anything like that." Defendant had the keys to Victim's car and was unwilling to return them to Victim. Finally, Defendant threw

the car keys at Victim, hitting her in the chest. Snow "ended up knocking [Defendant] around a little bit and [Victim] got away and got in the car and drove off." Snow testified that he was "defending" Victim and "didn't feel it was right what [Defendant] was doing to [her]."

{48} At a critical point during this exchange, Victim told Snow that "[Defendant] had her for three days already, wouldn't let her use the phone, wouldn't let her out of his sight." Defense counsel filed a motion in limine, arguing that Snow's recitation of what Victim had said to him out of court was inadmissible hearsay and amounted to improper character evidence. *See* Rule 11–404(A) NMRA 2004 (providing that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion").

{49} We agree that Victim's statement that Defendant "had her for three days" was presented to prove the truth of the matter asserted; namely, that Defendant had been holding Victim against her will for the previous three days. Therefore, to be admissible, Victim's statement must fall within a recognized hearsay exception.

{50} The trial court admitted Victim's statement as an excited utterance, because Snow laid a predicate that Victim was distraught and fearful at the time she made the out-of-court statement. *See* Rule 11–803(B) NMRA 2004 (providing exception for statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). Defendant argues that the court abused its discretion in admitting Victim's statement as an excited utterance. Defendant does not argue that the admission of Victim's statement violated his constitutional rights, but only argues that Victim's statement was inadmissible under the Rules of Evidence. *Cf. State v. Lopez*, 1996–NMCA–101, ¶ 13, 122 N.M. 459, 926 P.2d 784 (reviewing de novo the defendant's constitutional claims regarding the reliability of an out-of-court statement admitted as an excited utterance, but applying abuse-of-discretion stan-

dard to question whether statement was properly admitted under the hearsay rule).

{51} In deciding whether to admit an out-of-court statement under the excited utterance exception,

the trial court should consider a variety of factors in order to assess the degree of reflection or spontaneity underlying the statement. These factors include, but are not limited to, how much time passed between the startling event and the statement, and whether, in that time, the declarant had an opportunity for reflection and fabrication; how much pain, confusion, nervousness, or emotional strife the declarant was experiencing at the time of the statement; whether "the statement was self-serving[; and whether the statement was] made in response to an inquiry[.]"

State v. Bonham, 1998–NMCA–178, ¶ 6, 126 N.M. 382, 970 P.2d 154 (quoting 2 John William Strong, McCormick on Evidence § 272, at 219 (4th ed.1999)), abrogated on other grounds by State v. Traeger, 2001–NMSC–022, ¶¶ 19–26, 130 N.M. 618, 29 P.3d 518. "[T]he trial court has wide discretion in determining whether the utterance was spontaneous and made under the influence of an exciting or startling event." Id. ¶ 7. Given that Victim was "distraught, ... upset," and looked "like she'd been crying" due to her inability to retrieve her car keys and free herself from Defendant's presence, there was a sufficient factual predicate to admit Victim's statement into evidence as an excited utterance.

{52} Defendant also contends that Victim's out-of-court statement amounted to improper character evidence because it demonstrated a prior bad act—that Defendant held Victim against her will—and was not relevant to the crime for which he was tried. Evidence of Defendant's prior bad acts is inadmissible to the extent it serves only to prove that he acted in conformity with an alleged propensity for violence. See Rule 11–404(B) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith."); Rule 11–403 (providing for exclusion of otherwise relevant evidence on grounds of undue prejudice). "On the other hand, evidence of Defendant's other bad acts can be admissible if it bears on a matter in issue, such as intent, in a way that does not merely show propensity." State v. Niewiadowski, 120 N.M. 361, 363–64, 901 P.2d 779, 781–82 (Ct.App.1995).

{53} The trial court did not rule on whether Victim's out-of-court statement was inadmissible character evidence. Accordingly, we determine that the admissibility of Victim's out-of-court statement under Rule 11–404(B) and Rule 11–403 may be addressed by the trial court, when, and if, this issue is raised at Defendant's new trial.

## CONCLUSION

{54} We reverse and remand for proceedings consistent with this opinion.

{55} IT IS SO ORDERED.

WE CONCUR: PAMELA B. MINZNER, RICHARD C. BOSSON, Justices, PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, Justice (concurring in part and dissenting in part).

SERNA, Justice (concurring in part and dissenting in part).

{56} I concur with the majority's conclusion that the trial court properly admitted the victim's statement. Respectfully, I dissent from the majority opinion's analysis and conclusions regarding the admissibility of Caplan's testimony. I would affirm Defendant's conviction for first degree murder.

{57} In New Mexico, diminished capacity, as a partial defense to first degree murder that lowers criminal responsibility to second degree murder, is mental illness or intoxication that results in the defendant's inability to form a deliberate intention to take away the life of another. The majority concludes that Caplan's testimony was "admissible, not for the purpose of proving the inability to deliberate, but rather to show that [Defendant] did not form a deliberate intent to kill." Majority opinion, ¶ 2. The majority holds that Caplan's testimony that Defendant's "neurological deficits," which result in "impulsiveness and difficulty in planning," was admissible "to show that he did not, at the

time of the killing, form the deliberate intent to kill," "not that Defendant was incapable of forming a deliberate intent" based on his mental illness. *Id.* ¶¶ 26, 28, 30, 901 P.2d 779. The majority, I believe, creates a distinction without a difference by attempting to separate diminished capacity from negating the element of deliberate intent with evidence of mental illness. The question in this case, whatever the label used, is whether Defendant should be allowed to introduce expert testimony of a mental illness to show a lack of deliberation for purposes of reducing first degree murder to second. This Court has previously defined this question as diminished capacity and created specific requirements for its use, most notably the requirement that the mental illness cause an inability to deliberate. The majority creates a new rule allowing a defendant to offer expert testimony that, due to a mental illness that results merely in impulsiveness and poor planning, he or she did not possess a deliberate intent to kill at the time of the murder. In effect, the majority discards the requirements of a diminished capacity defense and renders the doctrine of diminished capacity in New Mexico a nullity.

{58} The trial court has discretion regarding the admission or exclusion of evidence, and a trial court's evidentiary ruling will not be disturbed on appeal absent an abuse of that discretion. *See State v. Brown,* 1998–NMSC–037, ¶ 32, 126 N.M. 338, 969 P.2d 313. In order to find an abuse of discretion, this Court must conclude that the trial court's decision to admit testimony was obviously erroneous, arbitrary, or unwarranted. *Id.* ¶ 39. To conclude that the trial court abused its discretion, we must hold that the decision was against the logic and effect of the facts and circumstances of the case and that the decision was clearly untenable or was not justified by reason. *Id.* ¶ 32. I do not believe that the trial court's exclusion of evidence was obviously erroneous, arbitrary, unwarranted, and clearly against logic under the circumstances of the case. I believe that the trial court correctly determined that Defendant was attempting to present Caplan's testimony to support a diminished capacity defense and that Caplan's testimony was not of a sufficient quality to be admissible on the issue of diminished capacity under established New Mexico law.

{59} Defendant attempted, at trial and on appeal, to support a diminished capacity defense. At the telephonic hearing with Caplan in the trial court, defense counsel's ultimate question posed to the expert was whether, even though Defendant could form specific intent, he had a "diminished capacity which results in problems in controlling impulses, anticipating dangerous situations, and the ability to postpone or discriminate in achieving his goals." Defendant, in characterizing his trial argument, states that "[d]efense counsel *always* offered the evidence to prove that [Defendant] had a diminished capacity to deliberate or premeditate," and acknowledges that "[t]he theory of relevance argued on appeal is the *only* theory of relevance the trial attorney ever suggested." Defendant, on appeal, argues that "evidence that [Defendant] had a diminished capacity to judge circumstances and lacked the ability to control his behavior due to a neurological deficit was relevant to the distinction between first and second-degree murder." In response to defense counsel's question of whether he suffered from "diminished capacity," Caplan could only testify that, generally, Defendant's neurological dysfunction tended to produce *difficulties* with apathy, lack of motivation, ability to control one's behavior, impulsivity, impatience, being easily distracted, and poor work habits. Caplan stated that Defendant did have the ability to form specific intent as he understood the term. Caplan did not state that Defendant was *unable* to plan or control his impulses; Caplan could only state his opinion that Defendant, due to mental illness or injury, had some "difficulty" and some "problems" doing such tasks that would potentially translate into difficulty in deliberation. Thus, I believe it is clear that Defendant's sole argument regarding the relevance of this evidence is that he has a diminished capacity that should reduce his culpability from first to second degree murder.

{60} In this context, I believe that the trial court's ruling was not only a proper exercise of discretion but actually required by New Mexico case law. This Court has defined

diminished capacity as "the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design." *State v. Padilla*, 66 N.M. 289, 292, 347 P.2d 312, 314 (1959). In other words, this theory allows a defendant to challenge the State's proof of the element of deliberate intent to reduce the degree of homicide based on mental illness, which is identical to the majority's characterization of Defendant's intended use of Caplan's testimony. Our cases regarding the admission of expert testimony to demonstrate that, due to mental illness, a defendant could not form deliberate intent require the inability to do so. I believe that *Padilla* and *State v. Lujan*, 94 N.M. 232, 608 P.2d 1114 (1980), *overruled on other grounds by Sells v. State*, 98 N.M. 786, 653 P.2d 162 (1982), control and are not distinguishable. *Padilla* defined diminished capacity and concluded that, when evidence of diminished capacity is presented, the trial court had a duty to give an instruction on that theory "and not submit a mere abstract statement of the law." *Padilla*, 66 N.M. at 296, 347 P.2d at 316. *Lujan* clarified that the evidence of diminished capacity must show an inability to deliberate. In *Lujan*, as in the present case, the theory of defense was a diminished capacity to form a deliberate intent. 94 N.M. at 233, 608 P.2d at 1115.

> There is evidence in the record that the defendant was able to form a deliberate intention, with no evidence to the contrary. There was some expert testimony that the defendant was unable to control his emotions and was unable to stop himself from committing the homicides. *But the inability to form an intention is distinct from those,* and unless there is evidence that the defendant could not have formed the requisite intent, the diminished responsibility instruction is improper.

*Id.* at 233–34, 608 P.2d at 1115–16 (emphasis added). This Court thus concluded that while the defendant presented expert testimony that he had impulse control problems with regard to his actions as well as being unable to control his emotions, the defendant did not show, as required, that he could not form a deliberate intention. As a result, the defendant was not entitled to advance the theory of diminished capacity.

{61} I believe the same is true in the present case. While Caplan was of the opinion that Defendant has difficulty in the area of impulse control and planning, he specifically stated that Defendant had the ability to form specific intent. As noted below, I believe that, in the context of the defense argument that diminished capacity due to mental illness should reduce first degree murder to second, specific intent can only mean deliberate intent. Defendant concedes on appeal that no New Mexico case supports the admission of expert testimony to establish a tendency to have difficulty planning, as opposed to an incapacity to form a deliberate intent.[1] There is no defense in New Mexico of a partial diminished capacity, or in other words, an impeded but existing ability to form a deliberate intent based on mental illness. In New Mexico, as demonstrated by *Lujan*, diminished capacity is a term of art that requires more than a diminished ability to form a deliberate intent; it requires an inability to form a deliberate intent. *See State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995) (approving of the trial court's modification of the defendant's jury instruction on diminished capacity and noting that the defendant's "theory at trial was that he was insane at the time of the killing and, because of his mental illness, *was unable to form the deliberate intent* to kill the victim") (emphasis added); *State v. Beach*, 102 N.M. 642, 644 n. 1, 699 P.2d 115, 117 n. 1 (1985) ("Although the defendant raised the issue as diminished capacity, in New Mexico, ... it is raised as inability to form the specific intent required to commit a crime."), *overruled on other grounds by State v. Brown*, 1996–NMSC–073, 122 N.M. 724, 931 P.2d 69; *Padilla*, 66 N.M. at 292, 347 P.2d at 314 (noting

---

1. Although not cited by Defendant, the majority relies on *State v. Elliott*, 96 N.M. 798, 635 P.2d 1001 (Ct.App.1981) and *State v. Ellis*, 89 N.M. 194, 548 P.2d 1212 (Ct.App.1976). However, these cases did not involve the use of mental illness to negate mens rea; these cases instead allowed expert testimony of a defendant's mental state at the time of the crime. Moreover, having been decided by the Court of Appeals, these cases must be interpreted as consistent with cases from this Court, namely *Padilla* and *Lujan*.

that the phrases diminished responsibility and partial responsibility are "misnomer[s]"). Thus, I believe that the trial court correctly excluded Caplan's testimony under *Lujan* and that this exclusion was not an abuse of discretion.

{62} Defendant argues on appeal that the trial court based its ruling on Caplan's statement that Defendant could form a specific intent. Defendant argues that his "expert would have testified that even though [Defendant] did not have a diminished capacity to form specific intent, he did have a diminished capacity to plan or deliberate." He argues that Caplan distinguished the ability to form a specific intent from an ability to form deliberate intent and that the trial judge erred in failing to recognize this distinction. This argument fails for three reasons. First, I believe Defendant misconstrues the ruling; the trial court fully understood his argument below. The judge stated,

> So you're attempting to establish some kind of diminished capacity in a legal sense based on [the expert's] testimony. But based on his testimony that he has presented so far, I don't see how you would get me to give the jury the jury instruction 14–5110 on diminished capacity, because the way the instruction reads we would also have to amend the elements instruction for first degree murder to state that . . . the burden of proof on the state is another element, the defendant was not . . . suffering from a mental disease or disorder at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another. . . .

The trial court's specific reference to UJI 14–5110 NMRA 2004 refutes Defendant's argument that the trial court ignored the expert's opinion regarding Defendant's ability to form a deliberate intent or misinterpreted the ex-

pert's reference to specific intent. UJI 14–5110 specifically refers to "the defendant's ability to form the deliberate intention to take away the life of another." UJI 14–5111 NMRA 2004, by comparison, deals more generally with the capacity to form specific intent for non-homicide cases. The judge's reference to UJI 14–5110, rather than UJI 14–5111, demonstrates that the judge understood the particular type of specific intent at issue in this case. The judge correctly noted that UJI 14–5110 requires that an additional element be added to the first degree murder instruction, specifically, that the State must prove beyond a reasonable doubt that Defendant did not suffer from a mental disorder at the time of the offense "to the extent of being incapable of forming an intent to take away the life of another."[2] The trial court also correctly concluded that the expert's testimony was inadequate to trigger this additional element because the expert testified that Defendant was capable of forming a specific intent, even though he had difficulty doing so.

{63} Second, a closer inspection of the expert's report, which the trial court admitted at Defendant's request for purposes of ruling on the admissibility of the evidence, reveals that the expert did not distinguish between an ability to form a specific intent and an ability to form a deliberate intent. Instead, the expert distinguished between an ability to form a specific intent and a difficulty in planning and controlling impulses.

{64} Third, I agree with the State that, when a defendant argues that he or she has a diminished capacity that would reduce first degree murder to second, there is no distinction between arguing diminished capacity to form specific intent and diminished capacity to deliberate. In other words, the specific intent at issue in this case is deliberate intent, and a diminished capacity defense seeks to negate the element of deliberation by

---

2. Although the majority notes in dicta that the essential element added to UJI 14–201 NMRA 2004 should use the phrase "a deliberate intent" rather than "an intent," I believe that the "intent" at issue is abundantly clear to the jury based on the element of deliberate intent, along with its extensive definition, in UJI 14–201 and the explanatory discussion of diminished capaci-

ty in UJI 14–5110, which states that "[t]he burden is on the state to prove beyond a reasonable doubt that the defendant was capable of forming a deliberate intention to take the life of another." This language "immediately follow[s]" UJI 14–201 in the instructions to the jury. UJI 14–5110 use note.

showing an inability to deliberate. *See State v. Campos*, 1996–NMSC–043, ¶ 39, 122 N.M. 148, 921 P.2d 1266 ("It is [the] deliberate intent to cause death, beyond the defendant's intentional actions, that makes premeditated first-degree murder a specific-intent crime."). Therefore, for these reasons, I believe that Defendant's appellate argument concerning the distinction between specific intent and deliberate intent is specious.

{65} The majority does not discuss diminished capacity and instead attempts to create a new use for evidence of mental illness while concluding that Defendant did not raise a diminished capacity defense. As discussed above, I disagree with this characterization of Defendant's proposed use of the evidence in the trial court. I believe that Defendant was attempting to present a diminished capacity defense, through both argument of counsel and in the proffer of the expert's testimony. *See* majority opinion, ¶ 27 (" 'Given this man's history and evidence of neurological deficits, there is some evidence for diminished capacity.' ... Dr. Caplan described neurological dysfunction as 'sort of the underpinning to diminished capacity....' "). The majority distinguishes between a defense based on mental illness resulting in an inability to deliberate, which this Court has previously labeled diminished capacity, and a defense challenging the essential element of deliberate intent based on mental illness resulting in poor planning and impulsiveness. I am respectfully unable to accept this distinction for several reasons. First, I believe that Defendant did not preserve this argument in the trial court. Second, and most importantly, I believe that the contrast between a defense of diminished capacity and a defense negating the element of deliberation based on mental illness creates a false distinction. Third, I believe that, even accepting this distinction, the evidence offered by Defendant was of such minimal probative value in comparison to the potential for misleading the jury that the trial court did not abuse its discretion in excluding the evidence under Rule 11–403 NMRA 2004. Fourth, even if the trial court abused its discretion in excluding the evidence, I believe it was harmless error.

{66} The majority characterizes the issue as whether Defendant was entitled to present evidence to assist the jury in weighing his contention that he lacked the deliberate intent necessary for a conviction of first degree murder. I believe that the question is not Defendant's general right to challenge the State's evidence of deliberation. It is of course the State's burden to prove the element of deliberate intent beyond a reasonable doubt, and Defendant has many avenues of attacking the State's proof on this issue. *See State v. Provost*, 490 N.W.2d 93, 102 (Minn.1992) ("This is not to say that factual evidence bearing on defendant's mentally abnormal condition is not admitted. This kind of evidence comes in as a matter of course, as, for example, in this case, where the jurors heard evidence on the history of the relationship between the defendant and his wife."). The more specific question presented by this appeal, however, is whether Defendant can present expert testimony of a mental illness resulting in poor planning to challenge the element of deliberation. As the Supreme Court of Minnesota has concluded, "[t]he concern is whether expert opinions should be allowed to add a psychiatric gloss." *Id.* Respectfully, I believe that even if a distinction could be drawn between a diminished capacity defense as defined by our case law and a lesser mental illness defense based on the element of deliberation, I do not believe that this argument, that Caplan's testimony is relevant not to a diminished capacity defense at all but instead as simply evidence which tends to negate the element of deliberation, was made to the trial court as required by our rules of preservation.

{67} The trial court specifically stated that the expert was of the opinion that Defendant's mental condition did not affect his ability to form specific intent. The trial court asked the expert, "the question is presented in this case ... whether or not [Defendant] was suffering from some kind of mental disease or disorder at the time the offense was committed to the extent that he was incapable of forming an intent to take away the life of another person." The trial court then asked defense counsel if she had any further argument, and she answered, "I'm not sure what argument you're asking

for. Whether or not he should be allowed to testify?" The trial court again indicated that he thought the defense was "attempting to establish some kind of diminished capacity in a legal sense" based on the expert's testimony and that Defendant "was not suffering from a mental disease or disorder at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another." The trial court then told defense counsel, "I don't think you have evidence from this testimony that's admissible to prove that." The trial court again asked defense counsel whether she wanted to make any further record, and she stated that she wanted the report admitted as an exhibit but did not make any argument other than diminished capacity. The trial court understandably viewed the offer of Caplan's testimony as invoking the doctrine of diminished capacity because, prior to the majority's opinion in this case, that was the only recognized use in New Mexico for such testimony. Defense counsel did nothing to alert the trial court to a different argument and, in fact, actively pursued a line of questioning during the proffer on diminished capacity. If defense counsel actually intended to use Caplan's testimony simply to support his challenge to the State's burden to prove deliberate intent, there is no reason why defense counsel could not have made this argument to the trial court to demonstrate to the court why it erred in finding that the testimony was insufficient to show diminished capacity. I believe it was Defendant's obligation to make the argument to the trial court because the trial court clearly did not understand this desired use of the testimony.

{68} "A trial is first and foremost to *resolve* a complaint in controversy, and the rule [of preservation] recognizes that a trial court can be expected to decide only the case presented under issues fairly invoked." *State v. Gomez*, 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1.

> [I]t is the responsibility of counsel at trial to elicit a definitive ruling on an objection from the court. It is also trial counsel's duty to state the objections so that the trial court may rule intelligently on them and so that an appellate court does not

have to guess at what was and what was not an issue at trial.

*State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). Defendant never gave the trial court an opportunity to consider any use of the expert testimony other than a diminished capacity defense. Thus, a ruling on this issue was not fairly invoked.

{69} Defendant argues, in his reply brief, that he properly preserved this issue through his opening statements, as well as during the hearing. The majority also appears to rely on defense counsel's opening argument to support the conclusion that Defendant properly preserved his argument, although the majority concedes that "the preferred practice would have been for defense counsel to reiterate clearly for the court the purpose for which she was offering Dr. Caplan's testimony and to formally object to the trial court's ruling." Majority opinion, ¶ 20. Remarkably, although the majority recounts defense counsel's opening statement, the majority does not discuss the argument defense counsel actually presented to the trial court during the discussion of the admissibility of Caplan's testimony. Defense counsel argued at trial that Caplan's testimony would demonstrate Defendant's *"diminished capacity* which results in problems in controlling impulses, anticipating dangerous situations, and the ability to postpone or discriminate in achieving his goals." (Emphasis added.) Respectfully, I believe we must base our conclusions regarding preservation on the argument defense counsel actually made to the trial court. I do not believe that the trial court could be expected to disregard the arguments being made by counsel and Caplan's opinions during the hearing on the admissibility of the evidence in favor of defense counsel's vague remarks during opening statement regarding the general mens rea distinction between first and second degree murder. Our rules of preservation require that a ruling be invoked in a timely manner. Trial courts cannot be expected to glean subtle legal arguments regarding the admissibility of evidence from ambiguous statements made to the jury at a time when the question of admissibility is not before the court. An argument made to the jury at a remote time and in a vague manner cannot

be said to have *fairly* invoked a ruling or to have provided the trial court with a reasonable opportunity to intelligently rule on the question now addressed by the majority. The majority also bases its conclusion that Defendant preserved his claim on the fact that the trial court raised this issue sua sponte. While I agree with the majority that the trial court invoked its own ruling on the question of the admissibility of the evidence, the trial court made this ruling in the context of Defendant's attempted presentation of a diminished capacity defense. The trial court clearly understood the purpose of Caplan's testimony as establishing a diminished capacity defense. Despite defense counsel's understandable surprise at the trial court's timing, nothing prevented counsel from making the new argument which the majority concludes Defendant makes on appeal in order to fairly invoke a timely ruling on this novel use of the evidence. Because the trial judge followed the proper sua sponte procedure set out in the majority opinion by outlining his concerns and by giving counsel a fair opportunity to respond, defense counsel had an obligation to alert the trial court to a permissible use of the evidence, just as any proponent of evidence would have to do in response to an objection by the opposing party.

{70} Regarding any reliance by Defendant or the majority on defense counsel's opening statement, this Court rejected an analogous argument in *State v. Apodaca*, 118 N.M. 762, 772, 887 P.2d 756, 766 (1994), which also involved a contention "that the court improperly limited the presentation of her defense" by excluding testimony. The Court recounted that the defendant had an initial use for the evidence and then decided to use the evidence for impeachment. *Id.* The Court rejected the defendant's argument that "mere mention of the evidence earlier that morning was sufficient to preserve the issue" and held that the "[d]efendant had the duty to inform the court of the nature of her objection so that the court could make an informed decision as to its admissibility." *Id.* Similarly, in this case, counsel's remarks in opening statement did not fulfill the requirements of preservation. Moreover, on appeal, Defendant argues that "[t]he judge was put on notice by defense counsel's opening state-

ment that Dr. Caplan would be testifying about [Defendant's] diminished capacity to deliberate and plan a murder." Thus, even if the opening statement could be said to preserve an argument, it preserved only a diminished capacity argument and not an argument that the evidence negates deliberation independently of diminished capacity. The trial court gave Defendant several opportunities to make further argument or additional claims. Defendant declined to do so. If Defendant truly preserved his argument in his opening statements, as he argues, he should have had no difficulties making this argument to the trial court when the issue was discussed during the hearing. Thus, I do not believe that Defendant preserved an argument in the trial court that the evidence was relevant to negate the element of deliberation without reference to the concept of diminished capacity. Because Defendant failed to demonstrate to the trial court that he was entitled to present evidence of diminished capacity, he was obligated to argue any new theory, such as relevance of "poor planning" mental disorder to challenge the element of deliberation, to the trial court in the first instance.

{71} The majority also relies on Rule 11–103(A) NMRA 2004 for its conclusion that Defendant properly preserved his argument. The majority notes that Rule 11–103(A) requires that the trial court's ruling affect a substantial right of the party and, for a ruling excluding evidence, the party seeking to admit the evidence must make known to the trial court the substance of the evidence by offer or by the context of the questions asked and concludes that these requirements were met by Defendant. Majority opinion, ¶ 21. I respectfully disagree. Even if the ruling affects a substantial right and the substance of the evidence is known by the trial court, the rule of preservation must still be met. Defendant certainly made an offer of proof as to the substance of Caplan's testimony, but the issue here is whether he preserved the legal argument as to the use of the evidence. The problem remains that Defendant did not inform the trial court of his desired use of Caplan's testimony and did not even attempt to correct the trial court's reasonable belief

that Defendant offered the testimony to support a diminished capacity defense. As our cases show, the requirement of an offer of proof in Rule 11–103(A)(2) is meant to supplement, not substitute for, the requirement in Rule 12–216(A) that a party fairly invoke a ruling in the trial court.

{72} In *State v. Baca*, 1997–NMSC–045, ¶¶ 12–15, 124 N.M. 55, 946 P.2d 1066, this Court addressed whether a defendant preserved his claim that the trial court erred by excluding testimony as hearsay because it did not meet the argued exception to the hearsay rule. We noted that "[a] defendant must obtain a clear ruling from the trial court in order to preserve the grounds alleged to have been in error," and we relied upon Rule 11–103(A) for the proposition that "[a]n objection that does not state the grounds for the objection preserves no issue for appeal." *Id.* ¶ 13. This Court also noted that "the objection need not be specific if the specific ground is apparent from the context." *Id.* In *Baca*, the defendant "tendered the evidence and requested that the trial court 'be fair' to his client and admit the ... testimony." *Id.* ¶ 15. We concluded that the defendant had not preserved the issue of whether the testimony constituted hearsay, despite the fact that the substance of the evidence was clearly known by the trial court and that the defendant argued that the testimony "would raise a reasonable doubt about the [d]efendant's guilt and would call into question the veracity of the [s]tate's witnesses." *Id.* ¶ 10. This Court stated that "the defense made no specific argument that the testimony should be admitted because it was not hearsay" and instead, following his argument that the trial court be fair by admitting the testimony, moved on to argue exceptions to the hearsay rule as a basis for admission. *Id.* ¶ 15. We concluded that "[t]he context of these arguments would not have put the court on notice that the defense objected to treatment of the testimony as hearsay" and held that the defendant failed to preserve the issue for review. *Id.*

{73} Similarly, Defendant in the present case failed to put the trial court on notice that he wished to present Caplan's testimony for anything other than diminished capacity.

Thus, I respectfully believe that the majority's treatment of preservation under Rule 11–103 conflicts with our precedent. *See Baca*, 1997–NMSC–045, ¶¶ 12–15, 124 N.M. 55, 946 P.2d 1066; *see also State v. Garcia*, 100 N.M. 120, 123, 666 P.2d 1267, 1270 (Ct. App.1983) (addressing rule 11–103(A)(2) and concluding that the defendant failed to make an offer of proof necessary to preserve the issue of whether the trial court properly excluded testimony).

{74} I do not believe that the trial court's sua sponte action should relieve Defendant of his obligation to preserve an argument separate from diminished capacity. Innumerable cases from this Court have required criminal defendants to properly preserve arguments for appeal, even where general or related objections were made to the trial court but the argument differed on appeal. *E.g., State v. Jacobs*, 2000–NMSC–026, ¶ 12, 129 N.M. 448, 10 P.3d 127 (concluding that the defendant's objection at trial that the jury would misuse evidence of escape did not preserve his appellate argument that joinder of the escape charge was improper, and holding that "absent fundamental error, even in a death penalty case issues must be properly preserved"); *State v. Harrison*, 2000–NMSC–022, ¶ 27, 129 N.M. 328, 7 P.3d 478 ("While it may be proper for a defendant to have multiple theories of the crime, Defendant, in order to preserve an argument for appeal, must alert the trial court as to which theory is at issue in order to allow the trial court to rule on the objection."); *State v. Allen*, 2000–NMSC–002, ¶¶ 17, 31, 128 N.M. 482, 994 P.2d 728 (noting that although a defendant objected after a witness testified, the objection was not timely, and thus applying fundamental error analysis to the unpreserved issue); *Apodaca*, 118 N.M. at 772, 887 P.2d at 766 (discussed above); *Baca*, 1997–NMSC–045, ¶¶ 12–15, 124 N.M. 55, 946 P.2d 1066 (discussed above); *Lucero*, 116 N.M. at 452–53, 863 P.2d at 1073–74 (recounting that defense counsel objected to the admission of testimony for relevancy but "conclud[ing] that trial counsel did not lodge an objection about the validity of [the expert's] testimony," so the error claimed on appeal was unpreserved); *State v. Chamberlain*, 112 N.M. 723, 730,

819 P.2d 673, 680 (1991) (noting that the defense objected to the prosecution's closing argument at the end of the argument while recognizing that "many of the asserted errors [on appeal] were not objected to by the defense," and holding that "[f]ailure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error"); *State v. Lopez*, 84 N.M. 805, 808–09, 508 P.2d 1292, 1295–96 (1973) (concluding that, although the defendant objected to the trial court that the state failed to prove all essential elements of a prima facie case, which the defendant argued included the issue that prosecution occur where the crime was committed, the defendant failed to preserve his appellate argument that venue was improper). Respectfully, I believe the majority's conclusion regarding preservation is inconsistent with these cases, especially considering the existence of a conference on the very issue between the parties and the trial court at which no reference was made to the argument later advanced on appeal. As we have previously stated, relaxation of the timely objection rule "may encourage the defense to gamble on the verdict with the intent of raising the claim of error on appeal if the gamble does not pay off." *State v. Clark*, 108 N.M. 288, 297, 772 P.2d 322, 331 (1989), *overruled on other grounds by State v. Henderson*, 109 N.M. 655, 664, 789 P.2d 603, 612 (1990), *overruled on other grounds by Clark v. Tansy*, 118 N.M. 486, 493, 882 P.2d 527, 534 (1994).

{75} The significance of the majority's reference to "the potential that the alleged error is fundamental" and its reliance on a fundamental error case is unclear to me. Majority opinion, ¶ 21. Although the majority concludes that Defendant properly preserved the issue, it appears that the majority is relying in part on the fact that it characterizes the error as potentially fundamental, a consideration not previously part of our preservation analysis.

{76} When an issue has not been properly preserved, we have the discretionary power to review it for fundamental error. However,

[t]he doctrine of fundamental error should be applied sparingly, to prevent a miscarriage of justice, and not to excuse the failure to make proper objections in the court below. With regard to a criminal conviction, the doctrine is resorted to only if the defendant's innocence appears indisputable or if the question of his [or her] guilt is so doubtful that it would shock the conscience to permit the conviction to stand.

*State v. Reyes*, 2002–NMSC–024, ¶ 42, 132 N.M. 576, 52 P.3d 948 (quoted authority omitted) (alteration in original). As discussed below, Defendant's innocence is not indisputable and his guilt is not so doubtful as to shock the conscience to permit his conviction to stand. In contrast to a fundamental error standard, if a defendant properly preserves a claim that the trial court erred in excluding evidence, appellate courts apply an abuse of discretion standard. Despite the reference to fundamental error review, the majority applies an abuse of discretion standard of review to Defendant's claim that the trial court erred in excluding his evidence. Majority opinion, ¶ 22. Thus, based on the majority's rejection of the State's argument that Defendant failed to preserve this claim and its application of an abuse of discretion standard of review, the majority treats the issue as properly preserved. Because our discretionary review for fundamental error under Rule 12–216(B) is separate and qualitatively different from our review of preserved errors under Rule 12–216(A), and because Defendant does not attempt to invoke fundamental error review or argue that the error in this case is fundamental, it is unclear to me why the majority refers to fundamental error review in its discussion of preservation.

{77} Beyond the issue of preservation, I do not believe that New Mexico law recognizes a distinction between the use of evidence of mental illness for diminished capacity and for negating mens rea. The trial court correctly rejected the evidence and jury instruction for diminished capacity because Defendant's expert could not opine that Defendant had an inability to deliberate, merely a problem or difficulty in doing so. As stated above, a defense of diminished capacity, as previously

defined in our cases, "means the allowing of proof of mental derangement short of insanity as evidence of lack of deliberate or premeditated design." *Padilla*, 66 N.M. at 292, 347 P.2d at 314. In other words, mental illness actually resulting in diminished capacity to deliberate reduces first degree murder to second because it negates the mens rea element of first degree murder. That is precisely the theory Defendant was attempting to present in this case. The majority states that Defendant wished "to show that he did not, at the time of the killing, form the deliberate intent to kill" based on his "neurological dysfunction." Majority opinion, ¶ 30. The majority avoids the use of the term "diminished capacity" and instead distinguishes the issue by contending that "[p]roof of incapacity to form the requisite deliberate intent ... is not the only means of defending against the State's allegation that the defendant acted with the deliberate intent to take away the life of the victim," relying on authority from other jurisdictions. Majority opinion, ¶ 31. However, cases from other jurisdictions have distinguished the use of mental illness as an excuse to criminal liability from the use of mental illness to negate mens rea. *See, e.g., United States v. Brawner*, 471 F.2d 969, 998 (D.C.Cir.1972) ("Our doctrine has nothing to do with 'diminishing' responsibility of a defendant because of his [or her] impaired mental condition, but rather with determining whether the defendant had the mental state that must be proved as to all defendants.") (footnote omitted). This distinction is inapposite in New Mexico. *Padilla* did not recognize the defense of diminished capacity as an excuse to criminal liability when the State has otherwise proved the elements of the crime beyond a reasonable doubt; instead, this Court recognized a defense to mens rea based on evidence of mental illness, that is, a means of negating the mental state element of the crime so as to negate guilt rather than excuse it.[3] Mental illness has been recognized as an excuse to criminal liability in New Mexico only if it

meets the definition of legal insanity. *See* UJI 14–5101 NMRA 2004. Thus, because New Mexico has already adopted a mens rea based form of diminished capacity, the question in this case is not whether there are other uses for evidence of mental illness but, instead, what limitations New Mexico places on this use. Based on *Padilla* and *Lujan*, New Mexico limits the use of evidence of mental illness as a means of negating mens rea to specific intent crimes and to evidence that establishes an inability to form the particular specific intent at issue.

{78} The majority concludes, " 'An abnormal mental condition may influence the probability that a defendant premeditated and deliberated-and so be taken into account by a jury in determining whether those states of mind existed in fact ... even though it did not eliminate the capacity for premeditation.' " Majority opinion, ¶ 31 (quoted authority omitted). This Court discussed the admissibility of "evidence of insanity, or rather, evidence of the condition of the mind of the accused at the time of the crime, together with the surrounding circumstances, ... introduced, not for the purpose of establishing insanity, but to prove that the situation was such that a specific intent was not entertained-that is, to show absence of any deliberate or premeditated design." *Padilla*, 66 N.M. at 295, 347 P.2d at 316 (emphasis, quotation marks and quoted authority omitted). We labeled this diminished capacity:

> The defendant maintains that the court should have instructed the jury that they might consider mental defects and mental condition in ascertaining whether or not the defendant had the power to deliberate the acts charged, so as to reduce the charge from first degree murder to second degree murder.
>
> The doctrine contended for by the defendant is sometimes referred to as that of "diminished" or "partial responsibility." ... [I]t means the allowing of proof of mental derangement short of insanity as

---

3. In fact, the court in *Brawner*, upon which the majority's *Peterson* case is based, relied on our decision in *Padilla* as a basis for adopting a mens rea based form of diminished capacity. *Brawner*, 471 F.2d at 1000 n. 63. It should also be noted

that federal law now precludes expert testimony on the ultimate question of the defendant's state of mind, Fed.R.Evid. 704(b), which makes federal law inconsistent with *Ellis* and *Elliott*.

evidence of lack of deliberate or premeditated design.

*Id.* at 292, 347 P.2d at 314. In other words, in *Padilla,* we considered the use of mental illness to negate the element of deliberation and allowed its use for a limited diminished capacity defense; it does not stand for the proposition that *any* evidence of a mental condition, such as a general tendency to be impulsive and a poor planner, is admissible to prove that a defendant did not in fact, at the time of the killing, form a deliberate intent to kill.

{79} In *Padilla,* this Court began by mentioning the insanity defense, which was described as "being incapable of preventing oneself from committing the act as a result of disease of the mind." *Id.* at 293, 347 P.2d at 314. We then addressed, as a matter of first impression in this state, the doctrine of diminished responsibility, or diminished capacity, based on mental illness. *Id.* at 292, 347 P.2d at 314. The Court noted that the trial court refused the defendant's tendered instruction, which stated,

> "If you find the defendant was legally sane, then the Court instructs you that as an additional defense if you find ... whether by reason of a disease or defect of the mind the defendant was *incapable* of thinking over the fatal act beforehand with a calm and reflective mind (or with a fixed and settled deliberation and coolness of mind) then, you shall find the defendant not guilty of first degree murder and will pass on to the question of whether he is guilty of second degree murder."

*Id.* at 293, 347 P.2d at 315 (emphasis added). This is a diminished capacity instruction. We noted that the defendant properly received an instruction on intoxication which instructed the jury that if it found that, due to defendant's use of alcohol or marijuana, " 'the mind of the defendant *was incapable* of that cool and deliberate premeditation necessary to constitute murder in the first degree,' " it should find him guilty of murder in the second degree. *Id.* (emphasis added). We then questioned

> as to why there should be a different rule and perhaps a more lenient one with respect to a user of alcohol or drugs than in

the case of one who may be afflicted with a mental disease not of his [or her] own making. If alcohol or drugs can legally *prevent a person from truly deliberating,* then certainly a disease of the mind, which has the same effect, should be given like consideration.

*Id.* at 294, 347 P.2d at 315 (emphasis added). This Court then quoted from cases we found to be "directly in point":

> "If the appellant was so afflicted with insanity that he [or she] was '*mentally incapable of deliberating or premeditating, and to entertain malice aforethought, and to form a specific intent to take the life of the deceased,* in such event the jury should not find him [or her] guilty of murder in the first degree.' "

*Id.* (quoting *State v. Green,* 78 Utah 580, 6 P.2d 177, 186 (1931)). Not only did *Padilla* adopt diminished capacity as a defense, it compared it to intoxication rendering a defendant "incapable" of forming deliberate intent and adopted holdings which also set out diminished capacity as requiring that the mental illness be such that the defendant is "incapable of deliberating or ... form[ing] a specific intent to take the life of the deceased." *Id.* (quoted authority omitted).

{80} Although the State and the trial court understood Defendant's argument at trial to be diminished capacity as previously defined by our case law, the majority limits its discussion of diminished capacity to a distinction between the clear diminished capacity standard of an inability to form specific intent and the new standard of allowing evidence of mental illness which " 'may influence the probability that a defendant premeditated or deliberated.' " Majority opinion, ¶ 31 (quoted authority omitted). I believe that *Padilla* and the authority relied upon by this Court correctly set out the standard requiring that a defendant's admission of evidence of mental illness result in an incapacity to deliberate in order to negate the intent required for first degree murder. Certainly, in the more than forty years since this Court decided *Padilla,* no New Mexico case has interpreted *Padilla* as broadly permitting the introduction of any evidence of mental illness to negate mens

rea.[4] The reason this Court required an inability to deliberate rather than a mere tendency toward impulsiveness is, to me, both logical and sound. We concluded that evidence establishing mental illness resulting in an inability to form intent would demonstrate that, at the time of the murder, the defendant could not have formed the specific intent necessary to support first degree murder. Evidence of mental illness resulting in a propensity to be a poor planner or impulsive, on the other hand, as is the case with any other character trait such as a quick temper, does not shed adequate light on the defendant's intent at the time of the murder.

{81} Our observation in *Padilla* that diseases of the mind "should be given like consideration" as intoxication that prevents one from deliberating is instructive. The defense of diminished capacity due to intoxication has been limited to specific intent crimes and, like diminished capacity due to mental illness, requires a level of intoxication that results in an inability to form the relevant specific intent. *Ruiz v. Territory*, 10 N.M. 120, 133, 61 P. 126, 127 (1900) ("Voluntary intoxication is not a defense in law that will excuse the commission of the crime of murder in the first degree, or any other degree, unless such intoxication is so gross as to render the defendant incapable of knowing the difference between right and wrong, or incapable of forming a willful and deliberate intention to kill."); *accord State v. Begay*, 1998–NMSC–029, ¶ 38, 125 N.M. 541, 964 P.2d 102 (stating that when there is "evidence which 'reasonably tends to show that defendant's claimed intoxication rendered him [or her] incapable of acting in a purposeful way,' an instruction on diminished capacity is warranted") (quoting *State v. Luna*, 93 N.M. 773, 780, 606 P.2d 183, 190 (1980)); *State v. Cooley*, 19 N.M. 91, 103, 140 P. 1111, 1114 (1914) ("If, by reason of intoxication, the mind of the defendant was incapable of that cool and deliberate premeditation, necessary

to constitute murder in the first degree, . . . necessarily it would be murder in the second degree. . . ."). We have specifically rejected the argument that intoxication resulting in a diminished capacity can negate the mens rea for second degree murder and other general intent crimes. *Campos*, 1996–NMSC–043, ¶¶ 31–46, 122 N.M. 148, 921 P.2d 1266. In response to the dissent's argument that " 'knowing' is a specific state of mind that may be affected by external influences such as extreme intoxication or internal mental deficiencies that do not rise to the level of insanity," *id.* ¶ 62 (Franchini, J., dissenting), we held that "the legislature did not intend to depart from or legislatively overrule the long line of case law . . . that held intoxication is not a defense to second-degree murder." *Id.* ¶ 43. This Court also recognized the danger of diminished capacity defenses outside the confines of specific intent crimes:

> [R]eading the statute as allowing for an intoxication defense to second-degree murder could lead to surprising and unintended results. . . . [I]t is quite conceivable that a defendant who argues successfully that intoxication negated the knowledge mens rea for second-degree murder could not be convicted of any degree of homicide-under either the murder or manslaughter statutes-for the killing. This possibility most certainly was not intended by the legislature when it amended the murder statute.

*Id.* n. 6 (citations omitted). Based on our analysis in *Campos*, a defendant is not permitted to introduce evidence of intoxication to challenge the mens rea for second degree murder or felony murder. *Brown*, 1996–NMSC–073, ¶ 23, 122 N.M. 724, 931 P.2d 69. Thus, even though, as the dissent in *Campos* argued, evidence of intoxication might be relevant to the mens rea of general intent crimes, a trial court may properly exclude evidence of intoxication when the defendant

---

4. *Ellis* and *Elliott*, which are cited by the majority, did not interpret or even cite *Padilla*. The question in *Padilla* was not whether to add an element to the State's burden of proof or to create an additional instruction for the use of mental illness expert testimony for diminished capacity as compared to its use for negating mens rea. Instead, the question was whether to

allow a defense of mental illness in order to negate mens rea, and this Court recognized the defense but limited it to specific intent crimes and required evidence of an inability to form the specific intent. Thus, I do not believe that *Elliott* and *Ellis* modify *Padilla* or expand the permissible use of expert testimony of mental illness to negate mens rea.

is not legally entitled to assert a diminished capacity defense.

{82} I believe that the majority's analysis is inconsistent with this authority. Outside the limitations imposed by a diminished capacity defense, the majority allows Defendant to introduce evidence of mental illness to negate mens rea, restricted only by the principle of relevance. However, this rationale could apply equally to general intent crimes with requisite mental states that might be implicated by mental illness. If we were to give "like consideration" to mental illness and intoxication, as *Padilla* recognized is the preferred approach, then, relying on our rationale in *Campos,* I believe that evidence of mental illness to negate mens rea should continue to be limited to specific intent crimes and also limited to evidence demonstrating an inability to form specific intent. I believe that a broader rule conflicts with the legislative intent discussed in *Campos.* I respectfully believe the majority, although attempting to distinguish mental illness evidence challenging the element of deliberation from evidence of diminished capacity, actually expands the notion of diminished capacity and thus effectively greatly broadens New Mexico law on this issue.

{83} The majority agrees with Defendant that "testimony regarding Defendant's neurological deficits was relevant because, if believed by the jury, it would tend to make less probable the State's theory that Defendant killed 'as a result of careful thought.' " Majority opinion, ¶ 26. The majority concludes that "had the jury been provided with Dr. Caplan's testimony regarding Defendant's neurological deficits, the jury would have had specific evidence tending, to some degree, to refute the element of deliberation necessary for first-degree murder." *Id.* ¶ 27. I respectfully question these conclusions; I do not believe that the testimony tends to refute the element of deliberation. The majority describes Caplan's testimony as mental illness or neurological dysfunction resulting in planning difficulty and impulse control which Defendant is entitled to present to the jury to support his argument that he lacked the deliberate intent necessary for first degree murder because it demonstrates that he did not act with calculated judgement but instead

" 'went off.' " *Id.* ¶ 28. The majority concludes that the testimony is "relevant to whether Defendant formed the intent to murder Victim" deliberately or whether he killed her as the result of a mere unconsidered and rash impulse. *Id.* I question how a mental defect characterized by general poor planning and impulsiveness is relevant to deliberation on a specific occasion. A bank robber who is a poor planner still has the capacity to plan a bank robbery, however badly, and is thus responsible for it under the law. Similarly, in the present case, despite being a poor planner, impulsive, and quick-tempered, Defendant was fully capable of instructing his cohorts to lure the victim to an isolated area where he first strangled her, and, failing to achieve the desired result, requested a deadly weapon with which to beat the victim to death. The evidence of Defendant's mental defect does not show whether Defendant did or did not have a deliberate intent to kill the victim in this specific instance because it is only a mere tendency and Defendant still possessed the ability to do so. As the Supreme Court of Minnesota observed,

> In our view, psychiatric opinion testimony is not helpful on whether a person capable of forming a specific intent did in fact formulate that intent. Though a subjective state of mind may at times be difficult to determine, there is no mystery to mens rea, the latinism notwithstanding. Jurors in their everyday lives constantly make judgments on whether the conduct of others was intentional or accidental, premeditated or not. Thus, to do something intentionally is to do it with the purpose of accomplishing that something. To set a person on fire with the purpose of ending that person's life is to torch with intent to kill. The psychiatrist may look at what the defendant said and did to give an opinion whether the torching was done with intent to kill or to hurt, but the factfinder can do this too; indeed, it is the factfinder's job to do it, not the expert's as a thirteenth juror.

*Provost,* 490 N.W.2d at 101–02 (citation omitted). I do not believe that we should allow Caplan to become, effectively, a thirteenth juror. By allowing all psychiatric testimony

relevant to mens rea, I believe the majority opinion has the "potential to transform criminal trials into psychiatric shouting matches," *State v. Wilcox,* 70 Ohio St.2d 182, 436 N.E.2d 523, 533 (1982), and I believe that this battle of experts can only cloud the jury's determination of mens rea. *See Provost,* 490 N.W.2d at 100 ("The confusion that would result from inviting mental health experts into the legal arena to help establish criminal culpability is not to be underestimated; it is an invitation to semantic jousting, metaphysical speculation and intuitive moral judgments masked as factual determinations. The resultant confusion is not to be considered an adverse reflection on either law or psychiatry; rather, it is simply a reflection that the two disciplines speak from different perspectives." (quotation marks and quoted authority omitted)).

{84} Even if the evidence could be said to be marginally relevant, relevancy, as *Campos* showed in the context of intoxication, is not the only factor, or even the most important factor, in evaluating evidence offered to show diminished capacity in order to refute mens rea. *See Provost,* 490 N.W.2d at 99 ("[T]o conclude that psychiatric testimony may have some relevance to a guilty mind is only the beginning, not the end, of any inquiry into admissibility of that testimony."). Although a number of jurisdictions recognize a mens rea based form of diminished capacity, as New Mexico did in *Padilla,* the vast majority of these jurisdictions limit this defense to specific intent crimes regardless of notions of relevance as applied to general intent crimes. If New Mexico courts had previously intended to adopt the pure mens rea rule for evidence of mental illness that has been adopted by only a very small number of jurisdictions, there would have been no reason to limit the defense of diminished capacity to specific intent crimes and to an inability to form the relevant specific intent as this Court did in *Padilla* and *Lujan.*

{85} The majority describes the relevancy of the testimony as "tend[ing] to make less probable the State's theory" that Defendant acted deliberately. Majority opinion, ¶ 26. The notion that Defendant's impulsiveness mental defect is relevant to the murder itself because the disorder makes it more or less likely that he did not act deliberately is character evidence. *See* Rule 11–404(A)(1) NMRA 2004. In effect, I respectfully believe that the majority opinion replaces our previous standard of requiring an *inability* to form a specific intent with a propensity standard, thereby substituting a tendency for an incapacity and thus reducing the threshold requirement for the quantum of evidence required to make a diminished capacity defense. In other words, the majority's analysis permits Defendant to argue that, because Defendant, due to mental illness, tended to have difficulties planning, he would be less likely to have deliberated in this specific instance. I respectfully believe that the majority permits Defendant to argue the essence of diminished capacity without using that label or satisfying the requirements necessary to present the defense.

{86} New Mexico's diminished capacity defense allows a defendant to argue that he or she should be convicted of second degree murder rather than first because his or her mental illness, while not rendering the defendant legally insane, results in an incapacity to form deliberate intent; on the occasion in question, the defendant necessarily would have been unable to deliberate, and the defendant therefore unquestionably did not commit first degree murder. By contrast, under the majority's "likelihood" theory, the argument instead appears to be that, due to mental illness which results in a tendency to have a general difficulty planning or deliberating, like a character trait or propensity, a defendant might not have committed the crime in question if he or she was acting in conformity with his or her character. This theory represents a significant change in New Mexico law and, I believe, necessitates overruling some of our cases.

{87} The defense of diminished capacity was not recognized at common law and has been viewed with suspicion. Courts and legislatures are often wary that "subtle gradations of mental illness recognized in the psychiatric field are of little utility in determining criminal responsibility." *People v. Carpenter,* 464 Mich. 223, 627 N.W.2d 276, 283 (2001). As a result, a number of jurisdictions have rejected the defense in any

form, both as an excuse to criminal liability and to negate mens rea. *E.g., id.; Provost,* 490 N.W.2d at 99–102; *Chestnut v. State,* 538 So.2d 820 (Fla.1989). This Court noted a split in authority in *Padilla,* and even though New Mexico elected to adopt the defense, we limited the defense to specific intent crimes and required an inability to form the specific intent. On other occasions, this Court has rejected the argument of irresistible impulse as a complete defense, *see State v. Hartley,* 90 N.M. 488, 491, 565 P.2d 658, 661 (1977) (rejecting evidence that traits similar to those at issue in this case "*might* hinder [the defendant's] ability to prevent the commission of the alleged crimes" as inadequate to establish insanity), and we have viewed this type of propensity evidence with skepticism, *see Lytle v. Jordan,* 2001–NMSC–016, ¶¶ 35–36, 130 N.M. 198, 22 P.3d 666. If this Court extends the permissible evidence of mental illness to character, I believe it would be a fundamental change in this State's position on the use of mental illness either as a complete defense, i.e., insanity, or to negate mens rea, i.e., diminished capacity. Treating mental illness as character evidence could apply to any determination of mens rea, could extend beyond the limited context of specific intent crimes, and could result in a complete defense to criminal liability. As we indicated in *Campos* with respect to intoxication, I believe this use of mental illness evidence is contrary to legislative intent. *Cf. Carpenter,* 627 N.W.2d at 284 ("[T]he future safety of the offender as well as the community would be jeopardized by the possibility that one who is genuinely dangerous might obtain his complete freedom merely by applying his psychiatric evidence to the threshold issue of intent.").

{88} My concern is possibly best understood as questioning the relevance, or at the very least the probative value, of an expert opinion that Defendant's mental condition results in a mere tendency to have a difficulty planning. A diminished capacity, as that term has been used in New Mexico, negates the element of deliberation because a defendant's inability to deliberate in general would necessarily result in a lack of deliberation for the event in question. However, a mere

tendency to act impulsively does not necessarily mean that a particular act was accomplished on impulse, and a difficulty in planning does not necessarily mean that there was no plan on a particular occasion. Defendant's expert has no personal knowledge from which to testify that Defendant did or did not plan this murder. *See* Rule 11–602 NMRA 2004 (requiring that witnesses have personal knowledge of matters about which they testify). Thus, conformity with character can be the only relevance of his "tendency" testimony, yet this form of "diminished capacity character" or "partial diminished capacity" evidence has not previously been recognized in New Mexico and conflicts with the requirements of diminished capacity as it has been applied in this State. To me, evidence of a mental illness establishing a tendency is not relevant to an accused's mental state on a particular occasion. *See State v. Bouwman,* 328 N.W.2d 703, 705 (Minn.1982) ("[P]sychiatric evidence relative to the state's obligation to establish the intent of the defendant is argumentative and of no probative value."). Moreover, the State argues that evidence that a defendant who admits to a killing has problems controlling impulses merely states the obvious. I agree. *See Bethea v. United States,* 365 A.2d 64, 85 (D.C.1976) ("[I]t is obvious that brutal murders are not committed by normal people. To give (such) an instruction . . . is to tell the jury that they are at liberty to acquit one who commits a brutal crime because he has the abnormal tendencies of persons capable of such crimes.") (quoted authority omitted) (alterations and omission in original); *Chestnut,* 538 So.2d at 825 ("It could be said that many, if not most, crimes are committed by persons with mental aberrations. . . . Persons with less serious mental deficiencies should be held accountable for their crimes just as everyone else. If mitigation is appropriate, it may be accomplished through sentencing, but to adopt a rule which creates an opportunity for such persons to obtain immediate freedom to prey on the public once again is unwise."). I believe that allowing evidence of mere poor impulse control is inconsistent with the purposes of the Criminal Code. *See Hartley,* 90 N.M. at 491, 565 P.2d at 661 ("It is the duty of [people] who are not insane . . .

to control their evil passions and violent tempers or brutal instincts, and if they do not do so, it is their own fault, and their moral and legal responsibility will not be destroyed or avoided by such passions, or by their conduct resulting from them.") (quoted authority omitted); *Commonwealth v. Stasko*, 471 Pa. 373, 370 A.2d 350, 356 (1977) (applying a similar conclusion to evidence of a "tendency to have a short temper and erupt in sudden rages").

{89} I also am concerned that this broader view of diminished capacity is contrary to our guilty but mentally ill statute. NMSA 1978, § 31–9–3(A) (1982) provides that a defendant "who at the time of the commission of a criminal offense was not insane but was suffering from a mental illness is not relieved of criminal responsibility for his [or her] conduct and may be found guilty but mentally ill." The statute defines " 'mentally ill' " as

a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he [or she] did not know what he [or she] was doing or understand the consequences of his [or her] act or did not know that his [or her] act was wrong or could not prevent himself [or herself] from committing the act.

*Id.* Under the majority opinion, a defendant could be relieved of criminal responsibility for first degree murder based on a mental illness that falls short of both the legal definition of insanity as well as our definition of diminished capacity. *Cf. Carpenter*, 627 N.W.2d at 283 ("Through [the guilty but mentally ill statute], the Legislature has demonstrated its policy choice that evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent."). While the doctrine of diminished capacity as described in *Padilla* and *Lujan* could be said to survive the guilty but mentally ill statute, *see Sims v. Sims*, 1996–NMSC–078, ¶ 22, 122 N.M. 618, 930 P.2d 153 ("[N]o innovation upon the common law that is not clearly expressed by the legislature will be presumed."), I believe that the majority's expansion of the use of evidence of mental illness

as a defense to criminal conduct is inconsistent with the legislative intent expressed in Section 31–9–3. I further believe that such a change in New Mexico law relating to evidence of mental illness "should lie within the province of the legislature." *Bethea*, 365 A.2d at 92. Given the nationwide legislative response restricting the use of mental illness as a defense to criminal conduct, I would anticipate that the Legislature will reexamine this issue.

{90} The question in this case is, initially, one of statutory construction, as illustrated by our analysis of intoxication in *Campos*, and, secondarily, one of the trial court's application of the Rules of Evidence. With respect to the former, I believe that the majority's recognition of a defense to first degree murder based on mental illness falling short of the legal definition of insanity and diminished capacity is contrary to legislative intent. With respect to the latter, the question is whether the trial court abused its discretion in determining that the potential for jury confusion, waste of time, or unfair prejudice substantially outweighed the probative value of the evidence. Even if I were to conclude that evidence of mental illness resulting in general impulsiveness or poor planning is relevant to the element of deliberation, I believe that the trial court was properly concerned that the evidence might mislead the jury. The trial court specifically relied on Rule 11–403 and found that the expert's testimony would be a waste of time or would mislead the jury, concerns expressly articulated in this rule. "We have consistently afforded trial courts wide latitude in deciding whether to exclude, under Rule 11–403, otherwise admissible evidence." *State v. Coffin*, 1999–NMSC–038, ¶ 35, 128 N.M. 192, 991 P.2d 477.

{91} I believe that there was a substantial likelihood of jury confusion. Considering that Defendant would not have been entitled to receive an instruction on diminished capacity under *Lujan* and UJI 14–5110, I believe that the jury would have had difficulty understanding the legal import of the evidence. The evidence of mental illness, coupled with argument that the illness negates responsibility for the greater crime, might have

caused the jury to believe that Defendant was, in essence, arguing legal insanity or diminished capacity without any guidance regarding the legal definition or effect of these concepts. I also believe that the probative value of this evidence was minimal. The facts of the crime and the expert's own discussion of the crime itself strongly indicate that Defendant did in fact plan on this specific occasion, thereby substantially undermining any usefulness of the expert's opinion about general tendencies, as discussed below.[5]

{92} The majority recognizes that the trial court had a "legitimate concern that the jury might be misled" by Caplan's testimony. Majority opinion, ¶ 39. This recognition should end the inquiry in this case. If the trial court had a legitimate concern about jury confusion, it is the trial court's responsibility to weigh this concern against the probative value of the evidence. On appeal, this Court does not re-weigh the factors listed in Rule 11–403. Instead, we ask only whether the trial court's balancing can be described as unreasonable or against logic. The legitimate concern for jury confusion, combined with the minimal probative value of the evidence, makes it abundantly clear to me that the trial court acted well within its broad discretion.

{93} In response to the trial court's legitimate concern for jury confusion, the majority drafts a new instruction for mental illness not resulting in an inability to deliberate. However, it seems to me that the problem of jury confusion persists. The majority's instruction distinguishes the issue of whether the defendant "was incapable of forming the deliberate intention" without the context or definition of diminished capacity and then instructs the jury to consider the expert testimony to determine whether the defendant formed the deliberate intention. Majority opinion, ¶ 40. The only significant difference between the draft instruction and UJI 14–5110, as the majority appears to note, is that the prosecution does not have to also prove that despite the mental illness, the defendant

could form the intent to kill. However, the State retains the burden of proving the element of deliberate intent beyond a reasonable doubt. The added element of capacity to form a deliberate intent called for by UJI 14–5110 is merely intended to clarify the State's burden of proving mens rea. As a result, I do not believe that the majority's instruction clarifies to the jury how the law treats evidence of mental illness, what the legal definition of diminished capacity is, and why Defendant is not entitled to a diminished capacity defense based on Caplan's testimony.

> But if psychiatric opinion testimony is admitted on the issue of whether the defendant *did or didn't* have the requisite guilty mind, the jury will inevitably take the testimony as an invitation to consider whether the defendant *could or couldn't* have a guilty mind. Indeed, why else (so jurors would quite properly wonder) would the psychiatrist be testifying? Cautioning the jury not to consider diminished capacity or responsibility would only cause confusion. The law cannot giveth psychiatric testimony on the one hand and taketh it away with the other.

*Provost*, 490 N.W.2d at 100.

{94} Even if this new instruction did clarify the matter for the jury, however, I question how the trial court could abuse its discretion by not entertaining an instruction that neither previously existed in New Mexico law nor was presented to it by defense counsel. If Defendant's evidence has the potential for jury confusion, it should have been Defendant's burden not only to explain the intended use of the testimony to the judge but also to offer a way to clarify the issue for the jury. In the absence of such an argument, I believe that the majority places too great a burden on trial judges in performing the difficult gatekeeping task of screening evidence and enforcing the Rules of Evidence.

---

5. Although Defendant asserts that this case is similar to *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992), the determination of mens rea in that case was based on the *facts* surrounding the crime, not a general expert opinion. Applying *Garcia* here, the facts in this case establish a deliberate plan to murder the victim.

{95} Defendant argues that, by excluding Caplan's testimony, the trial court violated his constitutional right to present evidence. However, the trial court's ruling does not implicate this constitutional right. The trial court relied on Rule 11–403, and the proper exercise of discretion to exclude evidence based on this evidentiary rule does not have constitutional ramifications. *See Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability-even if the defendant would prefer to see that evidence admitted."). "[T]he proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible." *Montana v. Egelhoff,* 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). In *Egelhoff,* the United States Supreme Court upheld the authority of states to deny criminal defendants the opportunity to defend criminal charges with evidence of intoxication. Similarly, "a state is not constitutionally compelled to recognize the doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent." *Muench v. Israel,* 715 F.2d 1124, 1144–45 (7th Cir.1983). Thus, a defendant does not have a due process right to introduce evidence of mental illness not meeting the legal definition of insanity or diminished capacity in order to avoid or mitigate criminal responsibility. *See Wahrlich v. Arizona,* 479 F.2d 1137, 1138 (9th Cir.1973) (rejecting an argument that the defendant had a due process right to present expert testimony "tending to disprove an essential ingredient of the offense" apart from insanity or diminished capacity); *see also Stevens v. State,* 806 So.2d 1031, 1051 (Miss.2001) (affirming exclusion of expert testimony regarding an inability to form specific intent), *cert. denied,* 537 U.S. 1232, 123 S.Ct. 1384, 155 L.Ed.2d 195 (2003). In fact, some states have rejected any defense to criminal liability based on a mental illness that fails to meet the legal definition of insanity, whether as a diminished capacity defense or a defense to mens rea. *See, e.g.,*

*Smith v. Commonwealth,* 239 Va. 243, 389 S.E.2d 871, 879–80 (1990) (upholding exclusion of evidence of mental defect falling short of insanity offered to rebut premeditation); *Carpenter,* 627 N.W.2d at 283. New Mexico did not historically recognize a diminished capacity defense, and this Court did not adopt the doctrine of diminished capacity until *Padilla,* which accepted only a limited version of the defense that requires an inability to form a deliberate intent. *Padilla,* 66 N.M. at 292, 347 P.2d at 314. Thus, excluding evidence of mental illness failing to meet the legal definition of insanity or diminished capacity does not violate a fundamental principle of justice or, by extension, a defendant's constitutional right to present evidence. A defendant has no due process right to introduce evidence that is irrelevant or otherwise inadmissible under established rules of evidence. I would reject Defendant's argument; I believe that the trial court's application of Rule 11–403 should be assessed only under an abuse of discretion standard and independently of constitutional principles.

{96} I believe that the trial court, in its exercise of discretion, faithfully attempted to apply this Court's prior cases. As Defendant has argued, his defense was based on reducing first degree murder to second degree murder due to his diminished ability to deliberate. I believe that either Defendant can pursue this theory based on his proffer, in which case he is entitled to the diminished capacity instruction and the jury receives appropriate guidance, *see Padilla,* 66 N.M. at 296, 347 P.2d at 316 ("[I]t was the duty of the court to direct the jury's attention to the facts which the defendant contends constituted a defense, and not submit a mere abstract statement of the law."), or as in *Lujan,* his proffer is insufficient to meet the threshold requirement of diminished capacity, in which case he is not entitled to the instruction and, as the trial court determined, receiving evidence on a theory Defendant is not entitled to pursue would be a waste of time and confusing to the jury. The majority asserts that "New Mexico courts have long allowed such expert testimony relating to a defendant's mental state at the time of the commission of the offense." Majority opinion, ¶ 32. If this use of expert testimony is so

well established, however, I would question why Defendant did not make this new argument to the trial court and did not cite the cases the majority relies upon in either the trial court or this Court. I would not fault the trial court for referring to *Padilla* and *Lujan* based on Defendant's use of the term "diminished capacity" and for failing to devise the third option of a partial diminished capacity instruction similar to the majority's. Therefore, I do not believe the trial court abused its discretion in excluding the evidence under Rule 11–403.

{97} In any event, considering the majority's belief that the trial court misapprehended the law relating to expert testimony of mental illness, I question whether remanding for a new trial is the appropriate remedy. In an analogous situation, the federal Court of Appeals for the District of Columbia, whose *Peterson* case is cited by the majority, reaffirmed its position on the use of mental illness evidence from *Brawner* and reversed a trial court's exclusion of expert testimony. *United States v. Childress*, 58 F.3d 693, 730 (D.C.Cir.1995). However, based on the trial court's misapplication of law, the court remanded for an evidentiary hearing in order to allow the trial court, in the first instance, to assess the admissibility of the evidence under the federal equivalents to Rule 11–403 and Rule 11–702 NMRA 2004. *Id.* I believe this remedy would be more faithful to the proper role of an appellate court, as well as advancing judicial economy, than an outright remand for a new trial.

{98} Whether Defendant's argument is a distinction between diminished capacity to form specific intent and a diminished capacity to deliberate or simply an opportunity to present evidence of a mental illness resulting in a tendency to be a poor planner independent of a diminished capacity defense, because Defendant failed to properly preserve either claim, I would review these arguments for fundamental error. *See Chamberlain*, 112 N.M. at 730, 819 P.2d at 680 ("Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error."). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). I do not believe there has been a miscarriage of justice, and I do not believe the question of guilt is so doubtful that it shocks the conscience to affirm the conviction. I conclude that the evidence presented by the State in this case was overwhelming.

{99} Defendant and the victim were acquaintances. A relative of the victim's, Robert Snow, beat Defendant shortly before the murder. The victim's mother testified that Defendant went to her home at approximately one in the morning about a week prior to the murder, knocked heavily on the door, and said he wanted to speak to the victim. Defendant stated that "he had been jumped that night," and that he was "going to get her the next time she goes to town." The victim's mother testified that she asked if Defendant was threatening her daughter, and that he said yes. On August 10, the date of the murder, Defendant and his accomplices planned to lure the unarmed victim, a five foot three, ninety pound woman, to an isolated area. The victim was visiting a friend at the friend's trailer; the victim's distinctive gold Mustang was parked outside. The victim's friend and the friend's father testified that Arturo Carbajal and Robert Bertola walked up to their trailer and began a conversation with them.

{100} Carbajal testified that, earlier that day, Defendant met with him and Bertola and asked for a ride to the victim's friend's home, where Defendant thought he would find her. Defendant drove Bertola's black pickup while Carbajal and Bertola accompanied him as passengers. Carbajal testified that Defendant drove past the trailer, stating, "I'm not going to stop, I'm just going to go ahead and pass by, I don't want her to see me." A short distance away, Defendant stopped, told Bertola to walk back to the trailer and ask the victim for a ride to the store, and stated, "you know what to do." Bertola had Carbajal accompany him.

{101} Snow lived in the same trailer park as the victim's friend; he testified that he

saw a black pickup drive slowly down the street on the day that the victim disappeared. Snow testified that the truck came back a few minutes later, and after a few more minutes, he noticed two men walking down the street. The victim was preparing to drive her friend's father to the store when Bertola and Carbajal approached. The victim decided to take Bertola, Carbajal, and her friend's father to the store. The victim later returned her friend's father to the trailer and left with Bertola and Carbajal.

{102} Carbajal testified that Bertola drove them to an isolated area, stopped, and claimed that he needed to urinate; instead, he stood outside the car. Defendant arrived about five to ten minutes later, driving Bertola's truck. Carbajal testified that Defendant approached the car and said that he wanted to speak to the victim. The victim refused; after Defendant's third request to speak to her, he grabbed her, and then she slapped him. Defendant took the victim, threw her to the ground, and began kicking her. Carbajal testified that she asked for his help, but that he did not come to her aid. Carbajal testified that Defendant "got on top of her and was twisting her neck. He was saying this damn whore doesn't want to die, ... I need something to kill her, to kill this whore." Bertola retrieved a three foot steel pipe from the truck and gave it to Defendant. Defendant struck the victim, with a great deal of force, on the head and neck with the pipe two or three times.

{103} An autopsy revealed that the victim had bruises on her thigh, lower back, and head; several ribs were fractured, and other ribs were separated from the cartilage, consistent with the testimony that Defendant repeatedly kicked her. The victim sustained fractures in her third cervical vertebra, constituting a broken neck caused by either blunt force or twisting of her neck, consistent with testimony that Defendant twisted her neck and beat her on the neck with the pipe. The victim had an extensive fracture of her skull on her forehead, which indicated "considerable force," consistent with testimony that Defendant struck her head with the pipe. The victim also sustained fractures near her nose, on her jaw, and on the back of

her head. The cause of the victim's death was blunt force injury to her head and neck.

{104} Carbajal testified that Defendant, after he murdered the victim, said, "help me pick her up, I don't want to be caught or get caught." They moved the victim's body into the trunk and dumped it a short distance away, and then they drove the victim's car to Mexico. The victim's blood was found in the trunk of her car. Defendant's wallet and driver's license were found inside the car.

{105} Maria Carbajal, Carbajal's mother, also testified for the State. She testified that Defendant admitted to her that he had murdered the victim and dumped her body. Maria testified that Defendant said he killed the victim because she was responsible for Defendant being in jail on a particular occasion. She testified that Defendant said that Bertola handed him the pipe and that he described hitting her with it, saying that he "made sure she was dead."

{106} The State presented Defendant's statement to the police through Detective Frank Pena. Defendant claimed that he was cruising around in Bertola's truck when he happened to see his accomplices and the victim. He followed out of curiosity and parked behind the victim's Mustang. Defendant claimed that, out of concern for the victim, he tried to convince the victim to leave with him, but she declined. He stated that Bertola knocked the victim to the ground, kicked her, and began beating her with the pipe. Defendant stated that Bertola threw him the pipe and that he hit the victim a few times with the pipe. He said the victim was alive when he began to strike her. He stated that Carbajal did not participate in the murder. Defendant stated that Bertola and Carbajal were arguing, and one of them said, "something to the effect that they had to finish her. They had to kill her." Defendant stated that the victim was no longer conscious when they put her in the trunk of the Mustang; they then drove a short distance, they all got out of the car, opened the trunk, and removed the victim's body, who was at this time unresponsive and bleeding.

{107} The fact that Defendant killed the victim is undisputed. Even Defendant concedes that he had a plan to lure the victim to

an isolated area and, at the very least, beat her. Through Carbajal's testimony, the State demonstrated that Defendant planned to isolate the victim by directing his accomplices to lure and isolate her while concealing his presence. Carbajal's testimony demonstrates that Defendant was attempting to kill the victim by twisting her neck and, when that method failed to end her life, he asked for a weapon with which to kill her. This testimony provides direct evidence of Defendant's deliberate intent to kill the victim.

{108} The majority concludes that "the evidence was in direct conflict as to whether Defendant killed with deliberate intention or through a rash impulse," stating that the only eyewitness testimony was provided by Carbajal, "whose credibility was sharply contested." Majority opinion, ¶ 42. I respectfully disagree with the majority's limitation of Carbajal's testimony. This testimony was properly admitted, and there is no argument on appeal that it should not have been admitted; nothing in harmless error or fundamental error review allows an appellate court to reweigh the credibility of a witness and to then discount that witness's testimony. Carbajal's credibility may have been hotly contested at trial, but the weight of the testimony was to be determined by the jury. I also disagree that Carbajal's testimony is the only eyewitness evidence. Defendant's statement, offered by the State, is an admission and serves as an eyewitness account of the killing. As discussed below, I believe that Defendant's statement clearly supports that he killed the victim with deliberation. Maria Carbajal's testimony includes another admission by Defendant, an eyewitness, that directly supports deliberation. Maria recounted that Defendant admitted that he murdered the victim out of retaliation, supporting a deliberate intent. Maria also testified that Defendant "made sure [the victim] was dead," again supporting deliberate intent rather than a rash impulse.

{109} Further, beyond the question of eyewitness evidence, I respectfully disagree that only Carbajal's testimony supports the State's theory that Defendant committed first degree murder. Even without Carbajal's properly admitted testimony, I believe there was a great deal of evidence supporting deliberation. Snow testified that he beat Defendant. The victim's mother testified that Defendant, days before the murder at about one a.m., demanded to speak to the victim, stated that he had been attacked, and threatened to "get" the victim. Snow testified that, on the day of the murder, he saw Bertola's truck, which Defendant admitted he was driving, as well as Bertola and Carbajal, in the vicinity of the victim. The State provided testimony of the victim's friend and father that the victim left with Bertola and Carbajal, which supported an inference that the two men took the victim to the isolated location. This testimony supports the inference that Defendant and his accomplices drove Bertola's truck slowly around the victim's location before Defendant's accomplices lured the victim away and isolated her before killing her with a deadly weapon. All of this evidence, independent of Carbajal's testimony, provides a strong inference that Defendant planned, with accomplices, to isolate and then murder the victim. This evidence supports deliberation by bolstering the theory that Defendant had a motive to kill and a plan to carry out the threat.

{110} Defendant's statement itself leads to several different inferences that the murder was deliberate. Defendant stated that he heard Bertola and Carbajal discuss the need to kill the victim after she was incapacitated, that "they had to finish her," and that "they had to kill her." Defendant admitted the victim was alive, incapacitated, and unarmed before he struck her twice with the steel pipe. This evidence supports an inference that Defendant killed the victim with deliberation after a discussion by his accomplices while the victim was still alive. Little planning is required; deliberation may be formed "in a short period of time." *State v. Lucero*, 88 N.M. 441, 443, 541 P.2d 430, 432 (1975). Defendant's statement, considered alone, is also evidence of first degree murder rather than a rash impulse because it indicates that the three of them moved her while she was unconscious but still apparently alive and dumped her body, supporting yet another deliberate plan to kill her by leaving her incapacitated in an isolated area with life-threatening wounds. Thus, I do not agree

that the evidence of deliberation was in direct conflict; I conclude that the State's evidence overwhelmingly supports the jury's finding of deliberation.

{111} Even if I were to question and compare Carbajal's and Defendant's conflicting stories, I would point out that Defendant's story was extremely implausible. Despite independent evidence, such as the fact that Defendant admitted that he was driving Bertola's truck, and eyewitness testimony that this truck was seen in the victim's vicinity immediately prior to Bertola and Carbajal approaching the victim's location, Defendant claimed that he coincidentally saw the victim driving with the other men and followed out of concern for her and curiosity. Defendant claimed that he wanted to save the victim from the other men but admitted he joined in the beating, delivering the fatal blows with the pipe himself. Expert testimony that, generally speaking, Defendant had difficulties controlling his impulses and planning, I believe, was of such minimal probative value that it would not have affected the jury's verdict had it been admitted. Moreover, on appeal, Defendant contends that his theory of the case is that he deliberately tricked the victim into going to a remote place but that he did not plan in advance to kill her; instead, the killing was rash and impulsive. Defendant poses the key question for the jury as not *whether* Defendant formed an intent to kill but *when:* while he was driving to the remote location or while he concocted the plan to lure the victim to that location, such that there would be a deliberate intent, or, instead, while he was in the process of beating the victim, such that it would be rash and impulsive. Under these circumstances, the effect of Caplan's testimony would necessarily have been de minimus. Defendant's conceded plan to lure the victim to a remote location on the day in question would completely undermine Caplan's testimony that Defendant had difficulty planning. The jury had before it overwhelming evidence of the particular circumstances that support a careful plan to track down, isolate, and murder the victim. Caplan's testimony, not that Defendant was incapable of forming, and therefore did not form, a deliberate intent at the time of the murder, but instead, that Defen-

dant merely had a tendency to have difficulty planning and therefore might not have planned on this occasion, could not have affected the verdict in my mind.

{112} The majority relies in part on the fact that Caplan was Defendant's only witness. Majority opinion, ¶ 43. Respectfully, I am not persuaded that this fact is relevant. In this case, Defendant has admitted to at least second degree murder, I believe that his own statement supports deliberation, and he even concedes to planning to lure the victim. The fact that Defendant had no other witnesses reflects the strength of the State's case, not the value or potential impact on the jury of the excluded evidence. Although the majority concludes that "Defendant's utter dependence on Dr. Caplan for his defense exacerbates the potential for prejudice caused by the exclusion of Dr. Caplan's testimony," *id.*, I do not believe that dependence on otherwise inadmissible testimony makes that testimony admissible.

{113} The issue, whether Defendant committed first or second degree murder, was clearly before the jury. Caplan's testimony does not show whether, on this specific occasion, Defendant formed the deliberate intent to kill. Caplan's report contains conflicting admissions by Defendant, which would not have supported Defendant's theory. Caplan wrote that Defendant, following a head injury, claimed that he had " 'black outs' " when he becomes very angry, and that during such episodes, Defendant is " 'unaware of what happens.' " Caplan then wrote that, at the time of Caplan's "evaluation, however, he was able to recall many of the details of the instant offense," supporting the inference that Defendant was not so angry at the time of the murder that he had a blackout, and thereby negating, rather than supporting, the theory of an uncontrolled impulse.

{114} Even if I agreed that Defendant's arguments were preserved, and that the trial court erred by excluding Caplan's testimony, I believe the error would be harmless. The majority concludes otherwise, stating that "[i]f we accept only the testimony of Carbajal, ignore the defense cross-examination of him and also ignore Defendant's account of

the events of the murder, then surely the error is harmless." Majority opinion, ¶ 42. I respectfully disagree. The majority is instead disregarding the testimony of Carbajal, Maria Carbajal, and numerous other State's witnesses as well as significant portions of Defendant's statements in favor of select assertions which would support second degree murder. The majority does not discuss in its analysis Defendant's admission that he struck the unarmed, unconscious victim twice on the head and neck with a steel pipe in the context of his cohort's discussion that "they had to finish her" and "[t]hey had to kill her." Defendant's statement as a whole clearly supports deliberation, not a rash and impulsive killing, which explains the fact that the State introduced Defendant's statement. Under our cases, Defendant's statement alone would be sufficient to support his first degree murder conviction. *See State v. Sosa,* 2000–NMSC–036, ¶ 14, 129 N.M. 767, 14 P.3d 32 ("Based upon the evidence, a reasonable jury could determine that Defendant intended to kill [the victim] when he went to [the victim's] home armed with a gun, waited for him to arrive, and then shot the unarmed victim numerous times."); *State v. Cunningham,* 2000–NMSC–009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (concluding that evidence demonstrating that the defendant emptied one gun, returned to his vehicle to retrieve another gun, and then shot the incapacitated and defenseless victim supported deliberation); *State v. Coffin,* 1999–NMSC–038, ¶ 76, 128 N.M. 192, 991 P.2d 477 (rejecting the defendant's argument that he did not have enough time to weigh and consider the killing and affirming convictions when the defendant shot the victim several times while the victim was walking away or lying on the ground); *State v. Salazar,* 1997–NMSC–044, ¶ 46, 123 N.M. 778, 945 P.2d 996 (holding that "testimony alleging that the Defendant pursued [the victim], pointed the gun, and fired provides an adequate source of direct evidence that the Defendant acted with deliberation, intending to kill [the victim]"); *State v. Garcia,* 95 N.M. 260, 261–62, 620 P.2d 1285, 1286–87 (1980) (noting that the fact that defendant was the aggressor, that the victim tried to run away, and that, although only a few seconds elapsed, the defendant had the opportunity to weigh his actions before he shot and killed the victim supported his first degree murder conviction). When Defendant's statement is viewed in combination with the other evidence, there is no reasonable probability that the exclusion of Caplan's testimony contributed to Defendant's conviction.

{115} "In order to warrant reversible error, Defendant 'must show a reasonable probability that the court's failure to allow the testimony contributed to [Defendant's] conviction.'" *Apodaca,* 118 N.M. at 773, 887 P.2d at 767 (quoted authority omitted); *accord* Rule 11–103(A) NMRA 2004. Under a harmless error analysis for evidentiary errors that do not violate a constitutional right, the Court evaluates whether substantial evidence supports the conviction, *State v. Moore,* 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980), and assesses the strength of the State's case in relation to the excluded evidence, *see id.* Again, I believe there was overwhelming evidence to support the conviction, including but certainly not limited to Carbajal's testimony. *See State v. Williams,* 91 N.M. 795, 798, 581 P.2d 1290, 1293 (Ct. App.1978) (concluding that the erroneous exclusion of evidence offered by defendant "was harmless because the evidence of defendant's guilt was overwhelming").

{116} In addition, it is notable that, given the majority's acceptance of what I view as character evidence, the State would have been, and will be, entitled to ask Caplan about Defendant's prior instances of conduct in order to challenge the expert's opinion regarding Defendant's difficulty with planning. *See* Rule 11–405(A) NMRA 2004. The expert, in his report, identifies at least two prior instances of criminal conduct that likely would have required planning by Defendant. Cross-examination of this nature would severely limit the impact of the expert's testimony on the jury and, in my view, would have only strengthened, and will only strengthen on remand, the State's case, which might explain the State's decision not to object to this evidence below. Therefore, I do not believe that there is a reasonable probability that the trial court's exclusion of

the testimony contributed to Defendant's conviction.

{117} In conclusion, I agree with the majority that the trial court did not err by admitting the victim's statement, but I respectfully dissent from the portion of the majority opinion addressing admissibility of Defendant's expert's testimony. I would affirm Defendant's convictions.

I CONCUR: PETRA JIMENEZ MAES, Chief Justice.